**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------x
                                          :
In re:                                    :        Chapter 7
                                          :
W. Wesley Drummon,                        :        Case No. 19-10670 (JLG)
                                          :
           Debtor.                        :
-----------------------------------------------------------------x
                                          :
The City of Atlantic City,                :
                                          :
           Plaintiff,                     :        Adv. Pro. No. 19-01211 (JLG)
                                          :
v.                                        :
                                          :
W. Wesley Drummon,                        :
                                          :
           Defendant.                     :
-----------------------------------------------------------------x
```

**MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S MOTION**
**FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S CROSS-MOTION FOR**
**SUMMARY JUDGMENT AND MOTION FOR AN ADVERSE INFERENCE**

**APPEARANCES:**

TRENK ISABEL SIDDIQI & SHAHDANIAN P.C.
*Counsel to Plaintiff City of Atlantic City*
290 W. Mt. Pleasant Ave, Suite 2350
Livingston, New Jersey 07039
-and-
80 Pine Street, 10th Floor
New York, New York 10005
By:     Richard D. Trenk (*pro hac vice*)
        Sydney J. Darling
        Stephen Gengaro

LILES PARKER
*Counsel to Defendant Wesley Drummon*
2305 Calvert Street NW
Washington, District of Columbia 20008
By:     John P. Pierce (*pro hac vice*)

**HON. JAMES L. GARRITY, JR.**
**U.S. BANKRUPTCY JUDGE**

## Introduction[1]

W. Wesley Drummon ("Drummon") is a debtor in this Court under chapter 7 of the Bankruptcy Code.[2]  In this adversary proceeding, the City of Atlantic City (the "City") seeks to exclude the discharge of debts that Drummon allegedly owes to the City (the "Alleged Drummon Debt") from Drummon's bankruptcy, alleging Drummon defrauded the City.  On the Petition Date, the City's claims for fraud against Drummon were pending in the District Court Action in the United States District Court for the District of New Jersey (the "District Court").  The District Court denied the City's summary judgment motion against Drummon in that action.[3]

The City's claims against Drummon relate to two agreements from the summer of 2013 between the City and Zemurray Street Capital LLC ("Zemurray"), a company for which Drummon served as Managing Partner.  The agreements relate to providing lending services to eligible applicants from the City: an MOU dated May 31, 2013, and an Escrow Agreement dated July 25, 2013.  The City alleges that Drummon defrauded it with respect to these two agreements.  In its five-count Complaint[4] in support of this adversary proceeding, the City asserts that the Alleged Drummon Debt is not dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(4), and (a)(6)

---

[1]  Capitalized terms not defined in the Introduction shall have the meanings ascribed to them herein.

[2]  *In re W. Wesley Drummon*, No. 19-10670 (Bankr. S.D.N.Y. filed March 1, 2019).

[3]  *City of Atl. City v. Zemurray St. Cap., LLC*, Civil No. 14-5169, 2017 WL 6638203 (D.N.J. Dec. 29, 2017) ("*District Court Decision*").

[4]  *See Adversary Complaint Objecting to Discharge Pursuant to 11 U.S.C. §727 and Dischargability* [sic] *of Debts Pursuant to 11 U.S.C. §523* ("Complaint"), ECF No. 1.  Unless otherwise indicated, citations to "ECF No. _" refer to documents filed on the electronic docket of this adversary proceeding, *City of Atlantic City v. Drummon*, No. 19-01211.

2

(Counts One, Two, and Three, respectively) and that Drummon should be denied a bankruptcy discharge pursuant to 11 U.S.C. § 727(a)(4)(A) and (a)(4)(B) (Counts Four and Five, respectively).

The discovery in the adversary proceeding is closed. In the District Court Action, on the advice of counsel, Drummon invoked his Fifth Amendment right against self-incrimination in response to certain of the City's discovery requests. Drummon invoked his Fifth Amendment rights in this case and has not been deposed by the City.

There are two matters before the Court. The first are competing summary-judgment motions. Drummon filed a motion for summary judgment seeking to dismiss Counts One, Two, and Three of the Complaint (the "Drummon SJ Motion")[5] and the City filed a cross-motion for summary judgment for a determination that the Alleged Drummon Debt is excepted from discharge under sections 523(a)(2)(A), (a)(4), and/or (a)(6) of the Bankruptcy Code (the "City SJ Motion,"[6] and together with the Drummon SJ Motion, the "Summary Judgment Motions"). Drummon and the City oppose one another's motions. The second is the City's motion for an adverse inference (the "Adverse Inference Motion," and together with the Summary Judgment Motions, the "Motions"),[7] based on Drummon's reliance on his Fifth Amendment right against self-incrimination in this adversary proceeding. Drummon opposes the motion.

---

[5]    *Defendant Drummon's Memorandum of Points and Authorities in Support of His Motion for Summary Judgment*, ECF No. 101; *see Defendant Drummon's Motion for Summary Judgment*, ECF No. 100.

[6]    *The City of Atlantic City's Memorandum of Law in Opposition to Defendant Drummon's Motion for Summary Judgment and in Support of the City's Cross-Motion for Summary Judgment and for an Adverse Inference*, ECF No. 104; *see Notice of Cross-Motion of the City of Atlantic City for Summary Judgment Pursuant to FRCP 56, Incorporated into the Federal Rules of Bankruptcy Procedure by FRBP 7056, and Local Civil Rule 7056*, ECF No. 105.

[7]    *Memorandum of Law in Support of Plaintiff City of Atlantic City's Motion for an Adverse Inference Against Defendant W. Wesley Drummon*, ECF No. 89. This document is substantively identical to the City's first motion for an adverse inference in this Court. *Memorandum of Law in Support of Plaintiff City of Atlantic City's Motion for an Adverse Inference Against Defendant W. Wesley Drummon*, ECF No. 37.

For the reasons stated herein, the Court grants the Drummon SJ Motion and denies the City

SJ Motion.  The Court denies the Adverse Inference Motion.

## Jurisdiction

This Court has jurisdiction over the Motions pursuant to 28 U.S.C. §§ 1334(b) and 157(a)

and the Amended Standing Order of Referral of Cases to Bankruptcy Judges of the United States

District Court for the Southern District of New York (M-431), dated January 31, 2012 (Preska,

C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and (J).

## Facts[8]

### A.   Deliberations Leading Up to the MOU

Zemurray Street Capital, LLC is a Delaware limited liability company.[9]   City Fact

Statement ¶ 2.[10]   Drummon is a member of an entity called Taipan Holdings, LLC, which is, in

turn, a member of Zemurray.  *Id.* ¶ 3.  In July 2012, representatives of Zemurray and the City

---

[8]    The facts are gathered from the parties' statement of facts submitted pursuant to Local Bankruptcy Rule 7056-1, affidavits and other sworn statements submitted in connection with the Motions, and exhibits appended to those affidavits and statements.  *See Defendant Drummon's Statement of Facts in Support of His Motion for Summary Judgment* ("Drummon Fact Statement"), ECF No. 102; *City of Atlantic City's Response to Defendant W. Wesley Drummon's Statement of Undisputed Material Facts* ("City Fact Statement"), ECF No. 104-1; *Defendant Drummon's Response to City of Atlantic City Statement of Facts in Support of its Cross Motion for Summary Judgment*, ECF No. 107; *Affidavit of John P. Pierce* ("Pierce Affidavit"), ECF No. 102-1; *Affidavit of Diana Romero* ("Romero Affidavit"), ECF No. 102-6; *Affidavit of Lyle C. Holden* ("Holden Affidavit"), ECF No. 102-7; *Certification of Richard D. Trenk* ("Trenk Certification"), ECF No. 104-2; Certification of Sydney J. Darling ("Darling Certification"), ECF No. 104-29; *Supplemental Affidavit of John P. Pierce* ("Supplemental Pierce Affidavit"), ECF No. 108-1. The Darling Certification, in turn, attached the following sworn statements previously submitted in the District Court Action (defined below): (i) *Certification of Jim Thigpen in Support of Plaintiff Atlantic City's Motion for Summary Judgment* ("Thigpen Certification"), attached as Exhibit A to the Darling Certification; (ii) *Certification of Deputy Solicitor Michael J. Perugini, Esq. in Support of Plaintiff Atlantic City's Motion for Summary Judgment* ("Perugini Certification"), attached as Exhibit B to the Darling Certification; and (iii) *Certification of Director of Revenue & Finance/Chief Financial Officer Michael P. Stinson in Support of Plaintiff Atlantic City's Motion for Summary Judgment* ("Stinson Certification"), attached as Exhibit C to the Darling Certification.

[9]    In various documents submitted to the Court, Zemurray is referenced as "Zemurray Street Capital Corporation" rather than "Zemurray Street Capital, LLC."  In the District Court Action (defined below), Drummon clarified that the references to Zemurray Street Capital Corporation in documents were in error.  *District Court Decision*, 2017 WL 6638203, at *8 n. 2.

[10]    The Court will cite to facts in the Drummon Fact Statement or the City Fact Statement only to the extent the other side has indicated in its response that such fact is undisputed.

began discussions regarding the creation of a lending program to benefit the residents of the City. Pierce Affidavit, Ex. B at 10–13 of 52,[11]  Trenk Certification, Ex. B.  On December 3, 2012, Drummon sent a proposal to the City ("First Proposal").  Pierce Affidavit, Ex. C at 40–41.[12]  The First Proposal contemplated that the City would provide $3 million to Zemurray to, among other things, (i) acquire an entity called TN Business and Industrial Development Company ("TN BIDCO"), and (ii) obtain a $25 million credit facility that was being negotiated between Zemurray and Amalgamated Bank to originate Government-backed loans such as Fair Housing Administration ("FHA") and Small Business Administration ("SBA") loans.  *Id.*  The First Proposal described TN BIDCO as a business and industrial development company regulated by the Tennessee Department of Financial Institutions having all the powers of a Tennessee chartered commercial bank (except the ability to accept deposits).  *Id.*  It also mentioned that TN BIDCO was designated a "preferred lender" by the SBA.  *Id.*  With the acquisition of TN BIDCO, Zemurray could underwrite mortgages and SBA loans, and Zemurray would underwrite and fund $40 million in SBA and mortgage loans in the City.  *Id.*  The City's $3 million investment would be protected because the loans made under the program would be guaranteed by the Government, and based on projected income, Zemurray would be able to return the $3 million within six months of funding.  *Id.*

---

[11]    Exhibits B, C, and D to the Pierce Affidavit each contain numerous correspondence, drafts of agreements, transcripts, and other documents. The documents also contain differing bates-stamp identifiers. For simplicity, the Court will cite to the page number on the top of the page imprinted by the Court's electronic-filing system when referencing documents within these exhibits.

[12]    The City also asserts that Drummon sent an earlier proposal on August 28, 2012, although it does not appear in the record (the "August 28 Proposal").  City Fact Statement ¶ 2; *see* City SJ Motion at 6; Drummon SJ Reply at 6 ("But the City has neither produced in discovery nor presented as evidence as part of its motion a copy of the alleged August 28, 2012 Proposal"); Trenk Certification, Ex. B (containing a printout or an email sent from Drummon to Weber and Eddie Lax on August 28, 2012, which contained an unspecified document attachment).

On December 13, 2012, Drummon sent a revised proposal to the City ("Second Proposal") in advance of a meeting scheduled to occur the following day. Trenk Certification, Ex. C. In this version, the $3 million payment from the City would be invested with the $25 million credit facility from Amalgamated Bank for the purpose of originating FHA, SBA and other Government-backed loans. *Id.* Rather than acquire TN BIDCO as was contemplated in the prior iteration, the Second Proposal stated that Zemurray would "[c]ontract with" TN BIDCO to provide the loans. *Id.* The document stated that Zemurray would "underwrite and fund" mortgage and SBA loans as well. *Id.*

On December 18, 2012, Drummon sent another revised proposal ("Third Proposal"), which was styled as a more detailed "term sheet" for the lending program. Pierce Affidavit, Ex. B at 2, 16–18. The Third Proposal stated that the purpose of the program was to "[e]stablish the Atlantic City Community Lending Program to assist residents and small businesses with financing in conjunction with the Mayor's Office." *Id.* at 16. Specifically, the objectives set forth in the Third Proposal were, among other things, to (i) establish a pilot program to work with a limited group of the City's residents who are eligible to borrow under Government-insured financing programs, (ii) confirm TN BIDCO's participation in the lending program, and (iii) confirm the City's commitment to provide an initial investment of $4 million (up from $3 million in the prior proposals). *Id.* This version identified Zemurray as the "administrator" of the program that was entitled to an "arrangement fee" of $200,000 for administering the lending program. *Id.* It also contemplated that TN BIDCO would relocate to New Jersey, open an office in the City, and register with the New Jersey Housing and Mortgage Finance Agency. *Id.* at 16–17.

On February 15, 2013, Drummon's colleague sent the next iteration of the proposal ("Fourth Proposal")[13] to City representatives. Drummon Fact Statement ¶ 12. According to the transmittal email, this version narrowed the focus of the term sheet to the relationship between the City and Zemurray and how they would work together to deploy funds to qualifying loans in the City. Pierce Affidavit, Ex. B at 4.

On February 27, 2013, Drummon sent a document titled "Indicative Summary of Terms and Conditions" to City representatives. Pierce Affidavit, Ex. B at 6, Ex. C at 51–55. The document described how Zemurray intended to buy and sell loans in the secondary market to leverage a contribution from the City of $6 to $7 million into $40 million of loans. Pierce Affidavit, Ex. C at 51–52. The document referenced certain categories of SBA and FHA loans that would be part of the program. *Id.* An attorney representing the City requested more detail on the FHA portion of the program. On March 1, 2013, Drummon sent an updated draft. Drummon Fact Statement ¶¶ 14–15.[14]

## B.    The MOU and the Escrow Agreement

In March 2013, the City retained an outside law firm to negotiate and document the lending program with a memorandum of understanding ("MOU") to be followed by a formal contract. Drummon Fact Statement ¶ 18. On March 28, 2013, the initial draft of the MOU was submitted to Drummon. *Id.* ¶ 19. Throughout April and May of 2013, representatives of the City and Zemurray exchanged numerous drafts of the MOU with comments and proposed modifications. *See, e.g.*, Pierce Affidavit, Ex. C at 2–6, 19–24, 47–48; Ex. D at 8–26. The final version of the

---

[13]    A copy of the Fourth Proposal was not submitted by the parties.

[14]    There appears to have been other versions and iterations of proposal-type documents, *see* Drummon Fact Statement ¶¶ 17–18, but it is unclear whether those drafts were submitted to the Court.

MOU was dated as of May 31, 2013, and signed by Drummon on behalf of Zemurray and then-Mayor Lorenzo Langford on behalf of the City.  Pierce Affidavit, Ex. B at 32–34.  A subsequent formal contract never materialized.

The MOU stated the purpose of the lending program was to

> establish a loan fund (the "Loan Fund") in which monies will be used to assist: (a) small business owners in obtaining financing that will promote business growth and job creation in the City, (b) individuals in obtaining affordable mortgages and/or refinancing or modifying their existing mortgages on properties located in the City, and (c) individuals with the rehabilitation and development of other housing stock in the City.

MOU at 1.  The Loan Fund was to be funded by an initial payment of between $3 and $5 million from the City, which would be held in an escrow account and released only pursuant to the terms of an escrow agreement to be executed by Zemurray and the City.  *Id.* at 1–2.  Under the MOU, if the City paid the full $5 million into the Loan Fund within six months, then an aggregate amount of up to $40 million would be made available to lend.  *Id.* at 2.  If the City paid less than $5 million into the Loan Fund, then Zemurray would reduce the estimated aggregate lending amount accordingly.  *Id.*  The term of the Loan Fund would be five years starting from the date of the MOU.  *Id.* at 1.  Zemurray was obligated to provide quarterly reports to the City regarding the use of funds in the Loan Fund within forty-five days of the end of each quarter.  *Id.*  Zemurray was obligated to return the funds paid by the City to create the Loan Fund within thirty days of the conclusion of the five-year term.  *Id.*

As contemplated throughout the deliberations, the MOU provided that the lending program would fund Government-backed loans for residents of the City.  *Id.*  Although Zemurray was tasked with "oversee[ing] the implementation of the Loan Fund," the MOU specified that Zemurray would "use" TN BIDCO "to lend the monies in the Loan Fund."  *Id.*  The MOU also

specified that it was governed by New Jersey law and that its terms superseded "any and all prior agreements, written communications or understanding between the parties."  MOU at 2.

Zemurray, the City, and City National Bank of New Jersey, as escrow agent ("City National Bank") entered into an escrow agreement dated as of July 19, 2013, ("Escrow Agreement") governing disbursements of the Loan Fund.  Pierce Affidavit, Ex. B at 23–31.  As pertinent to the Motions, the Escrow Agreement created an escrow account ("Escrow Account") and authorized Drummon to instruct the escrow agent to disburse funds in the account:

> Except as expressly provided herein or as otherwise agreed to in writing by both an authorized signatory of City . . . and of Zemurray, no one other than the authorized signatories of Zemurray shall have the authority to give City National Bank instructions with respect to the Escrow Fund.
>
> City National Bank shall disburse all of the funds from the Escrow Fund within three (3) Business Days of City National Bank's receipt of written instructions from the [sic] Zemurray.

Escrow Agreement ¶¶ 4–5. [15]

On August 8, 2013, the City deposited $3 million into the Escrow Account.  Drummon Fact Statement ¶ 40.

## C.    Negotiations to Purchase TN BIDCO

In June 2012 (i.e., one month prior to the commencement of deliberations with the City), Drummon commenced negotiations to have Zemurray purchase all of the outstanding stock in TN BIDCO.  Trenk Certification, Ex. H.  In January 2013, Zemurray submitted a change-of-control application to the Tennessee Department of Financial Institutions (the "Department") seeking regulatory approval of Zemurray's purchase of TN BIDCO.  Trenk Certification, Ex. I.

---

[15]   Under the Escrow Agreement, Drummon was the sole authorized signatory for Zemurray.  *See* Escrow Agreement, Schedule A.

By letter dated February 28, 2013, the Department sought clarification from Zemurray on

several items including the following:

> According to the new business plan, [TN BIDCO] intends to originate real estate
> loans and consumer loans. . . . This does not appear to be a permissible activity for
> a Tennessee BIDCO. Please clarify or amend the Business Plan for consistency
> with the activities that are permissible for those of a Tennessee BIDCO.
>
> . . .
>
> What is the source of funds for the purchase price of [TN BIDCO]?

Trenk Certification, Ex. J.  By letter dated April 5, 2013, Zemurray responded to the inquiries.

Trenk Certification, Ex. K.  With respect to the two items identified above, Zemurray answered

that it had amended the business plan to "remove any reference to residential mortgage and

consumer loan origination," and that the funds to purchase TN BIDCO will come from "[e]quity

capital from the members of [Zemurray]." *Id.*

On April 18, 2013, the Department sent a second letter to Zemurray seeking additional

information.  Trenk Certification, Ex. L.  Among other things, the Department again sought an

explanation of the source of funds to pay TN BIDCO's "current shareholders and for the proposed

capital injection." *Id.* It reiterated that TN BIDCO is "prohibited from engaging in any residential

mortgage origination activity."  The letter also sought Zemurray's financial information and the

names of Zemurray's officers and directors.  *Id.*  By letter dated April 24, 2013, Drummon

responded that the "[t]he source of capital used by Zemurray for the payment to existing

shareholders is the proceeds from preferred units issued to members of [Zemurray]."  Trenk

Certification, Ex. M.  Further, Drummon replied that "TN BIDCO has no present plans to service

residential mortgages where any direct contact with the consumer is anticipated.  We will remove

any servicing language in the business plan." *Id.*  In June and July 2013, Zemurray provided its

financial statements and list of members to the Department.  Trenk Certification, Ex. N.

On August 2, 2013, Zemurray advised the Department that its capital injection into TN BIDCO upon the change of control would be reduced from $5 million to $3 million. Trenk Certification, Ex. O. By letter dated August 6, 2013, the Department responded that the reduced amount was acceptable. *Id.*

## D.    Zemurray's Purchase of TN BIDCO

An August 12, 2013 email from Jim Thigpen (then-President of TN BIDCO) memorialized a conversation he had with Drummon about Zemurray's purchase of TN BIDCO. Trenk Certification, Ex. R. Thigpen stated that Zemurray would wire $5 million to TN BIDCO, and then funds would flow to TN BIDCO stockholders. *Id.* On August 23, 2013, Drummon wired the $3 million in the Escrow Account to TN BIDCO's account held at First Bank in Lexington, Kentucky.[16] City Fact Statement ¶ 36; Trenk Certification, Ex. R. The $3 million was disbursed from TN BIDCO's First Bank account as follows:

- $2,232,686.77 was transferred to TN BIDCO's law firm (Trenk Certification, Exs. T and U) and subsequently distributed as follows:

    o $1,535,323 was transferred to TN BIDCO shareholders (Trenk Certification, Ex. T);

    o $692,363.77 was transferred to Citizens Tri-County Bank to pay off a line of credit (*id.*);

    o $5,000 was retained by the law firm for attorneys' fees for work on the transaction (*id.*);

- $20,000 was wired to Drummon (Trenk Certification, Ex. U);

- $600,000 was withdrawn from the First Bank account and deposited into an account held by TN BIDCO with Farmers & Merchants Bank (*id.*); and

---

[16]    Other than its correlation to the City's $3 million deposit into the Escrow Account, the record does not address the discrepancy between the $5 million payment contemplated by Thigpen and Drummon and the $3 million that was actually paid.

11

- $147,313.23 was unaccounted for.

*See District Court Decision*, 2017 WL 6638203, at *4.

On May 29, 2014, the Department wrote to Drummon, approving Zemurray's acquisition of TN BIDCO.  Trenk Certification, Ex. W.  However, TN BIDCO was not authorized to operate because Zemurray failed to inject $3 million of new capital into the business:

> Because of the increased risk inherent in the expanded markets and product offerings of the proposed business plan, Zemurray was required to inject three million dollars ($3.0 million) capital into TN BIDCO as a condition of approval of the acquisition of control.  Zemurray transferred three million dollars ($3.0 million) in August 2013, part of which was used to buyout the existing TN BIDCO shareholders.  As such, Zemurray failed to inject the full amount of unimpaired capital required to implement the proposed business plan.

> Due to the failure of Zemurray to inject the required capital, the **proposed business plan** (as submitted with the June 28, 2013 application and any subsequent revision) has **not been approved** by the Department for use or implementation by TN BIDCO.  TN BIDCO is **not authorized** to conduct any new activity or expansion of products and services as outlined in the proposed business plan . . . .

*Id.*

### E.    Zemurray's Performance Under the MOU

Zemurray was required to provide quarterly reports under the MOU but only provided a single report on March 24, 2014 ("Status Report").  Perugini Certification, Ex. H.  The Status Report provided as follows:

- Zemurray purchased the domain "www.acloanprogram.com" in early August 2013 and created a website for the program. The website included a contact form and toll-free number for potential clients. The website received a total of 199,564 hits.

- Zemurray had fielded 239 phone calls and received 268 forms on the program.

- Zemurray had met with sixty residents, twelve were prequalified for an SBA loan, and three of the twelve were completing loan applications.[17]

*Id.*

The City asked Zemurray on several occasions to provide documentation to substantiate the Status Report, but Zemurray failed to do so. Perugini Certification ¶ 39. The Status Report did not include information about the status of the money in the Loan Fund. From the date of the MOU until October 27, 2014, TN BIDCO did not make any loans under the lending program or provide any financial or loan assistance to residents or business owners in the City. Thigpen Certification ¶ 18.

**F.      The City Demands Return of the $3 Million and Terminates the MOU**

At the end of the third quarter of 2013, a representative of the City contacted City National Bank to obtain a bank statement for the Escrow Account. City Fact Statement ¶ 65. City National Bank responded that the $3 million was no longer in the account. Stinson Certification ¶ 10. Once the City learned that the $3 million was gone, it attempted to locate the funds but could not do so. *Id.* ¶ 12.

Between March and May 2014, Michael Perugini (then-Deputy Solicitor for the City) contacted Drummon on numerous occasions to try to secure the funds:

- March 19: Perugini spoke to Drummon and sent an email memorializing their conversation. Perugini requested an immediate accounting and that the funds "remain intact and frozen until" the City is satisfied that the funds are secure and being used for purposes set forth in the MOU. Drummon confirmed receipt the following day and advised that he would meet with others at Zemurray on the matter. (Perugini Certification, Ex. F);

- March 20: Perugini sent a formal letter to Drummon seeking the same information as in his email the day before. (Perugini Certification, Ex. G);

---

[17] Of these three applications, two contained pages which were completely inscrutable and the third was uncompleted. *District Court Decision*, 2017 WL 6638203, at *5.

- March 26: Drummon sent an email to Perugini stating that he had requested that the "bank and brokerage firm send funds in accounts." (Perugini Certification, Ex. I);

- April 3: Drummon sent an email to Perugini stating that Zemurray will "take action to restructure its balance sheet to return the Atlantic City Funds as expeditiously as possible." Perugini and Drummon exchanged further emails later the same day stating that the parties will take steps to "disband" the program, place the City's funds in a separate account, and return the funds to the City. Drummon added that "[w]e will fully work with you so we both can avoid the cost of litigation." (Perugini Certification, Ex. L);

- April 7: Perugini sent an email and letter to Drummon stating, among other things, that Drummon had not provided proof that the funds were secure or in a separate account. (Perugini Certification, Exs. M and N); and

- April 7–May 28: Perugini left a series of voice messages for Drummon but never received a response.

On May 7, 2014, the City adopted a resolution authorizing the cancellation of the MOU. Perugini Certification, Ex. O. On May 21, 2014, Perugini sent a letter to Drummon attaching the City's resolution and advising that the City will commence legal action against Zemurray. Perugini Certification, Ex. P.

## G.    District Court Action

On July 15, 2014, the City filed a lawsuit against Zemurray, Drummon and others in the Superior Court of New Jersey. In it, the City asserted claims against Zemurray, Drummon, and other defendants for breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, conversion, fraudulent transfer, and fraudulent concealment.[18] On August 19, 2014, that action was removed to the District Court. *See City of Atl. City v. Zemurray St. Cap., LLC*, Civil No. 14-5169 (D.N.J. filed Aug. 19, 2014) (the "District Court Action"). On April 7, 2016, Drummon was deposed in the District Court Action. Trenk Certification, Ex. Z. After answering questions about his ownership interest in Zemurray, the commencement of negotiations to acquire

---

[18]    The City also sought, as a remedy, to impose liability on the defendants under a veil-piercing theory.

TN BIDCO, and using a portion of the $3 million payment by the City to purchase TN BIDCO, Drummon invoked his Fifth Amendment right against self-incrimination for the remainder of his deposition. *See generally id.*; City Fact Statement ¶¶ 96–100. Drummon similarly invoked his Fifth Amendment right in the vast majority of his responses to requests for admissions served by the City. Trenk Certification, Ex. AA; City Fact Statement ¶ 101.

In the District Court Action, the City moved for summary judgment on its claims.[19] The District Court granted the motion in part and denied it in part. The District Court granted the City summary judgment on the breach of contract count with respect only to Zemurray, but it denied the motion with respect to Drummon, and it denied the City's motion on all other counts against both Drummon and Zemurray. It also declined to make an adverse inference based on Drummon's invocation of his Fifth Amendment rights.

The District Court's rulings on the City's breach of contract, breach of the implied covenant of good faith and fair dealing, and fraud claims are relevant to the matters herein and are described below.

### 1.    Breach of Contract

The City alleged three separate theories in support of its breach of contract claim against Zemurray: (i) failure to take action in furtherance of the MOU, (ii) unauthorized transfer of $3 million from the Escrow Account, and (iii) failure to comply with quarterly reporting obligations. *District Court Decision*, 2017 WL 6638203, at *10. The Court denied summary judgment on the argument that Zemurray failed to act in accordance with the MOU. It reasoned that, although little

---

[19]    Zemurray and Drummon moved for summary judgment but neglected to file a Local Civil Rule 56.1(a) statement, and so the District Court denied that motion and a subsequent cross-motion for summary judgment on procedural grounds. and it also sought an adverse inference based on Drummon's invocation of his Fifth Amendment rights.

occurred, "[i]t may well be that nothing ever happened because the situation on the ground was amenable to nothing ever happening." *Id.* at *12. The Status Report supported this inference. Despite 199,564 website hits and hundreds of calls received and forms submitted, only three loan applications were ever submitted. *Id.* "If only three applications were ever completed, the fact that no loans were ever made or even processed is unremarkable." *Id.* The Court also denied summary judgment on the City's theory that the purchase of TN BIDCO itself constituted a breach of the MOU. *Id.* at *13. The MOU stated that Zemurray would "use" TN BIDCO to lend money in the Loan Fund. At first blush, the Court saw no inconsistency between the MOU's language and the purchase of TN BIDCO because the term "use" could imply that an item must first be obtained or purchased before it is used. *Id.* The Court also noted that the MOU contained an integration clause stating that its terms superseded all prior understandings among the parties. *Id.* Nonetheless, the Court held that New Jersey law does not strictly apply the parol evidence rule, and the term "use" is broad enough to encompass either purchasing an entity or contracting with such entity. *Id.* at *14. Thus, the definition of "use" is ambiguous, and its meaning should be resolved by a jury. *Id.*

The Court likewise denied summary judgment on the City's argument that Zemurray's $3 million disbursement from the Escrow Account violated the MOU and Escrow Agreement. *Id.* at *15. District Judge Kugler explained that Zemurray's actions were permitted under those agreements:

> There is nothing in the [MOU] or the Escrow Agreement that indicates transfer of the $3 million out of the contract is in and of itself breach of the [MOU]. Indeed, the [MOU] envisioned a scenario in which Zemurray would contract with TN BIDCO to administer the Lending Program. If Zemurray could use TN BIDCO under the [MOU], then it follows that Zemurray could transfer funds out of the Loan Fund to TN BIDCO, for there would otherwise be no other way for TN

16

> BIDCO to administer the funds. So the argument, repeated over and over again throughout this litigation, that Zemurray could not transfer anything out of the [Loan Fund] under the [MOU], is flatly contradicted by a straightforward application of the [MOU's] terms. We therefore do not agree that Zemurray breached the [MOU] simply by transferring the money out of the escrow account.

*Id.*

The Court did, however, grant summary judgment against Zemurray for failure to provide quarterly reports. *Id.* The MOU required Zemurray to provide such reports to track funds in the Loan Fund, Zemurray failed to provide timely reports, and the sole Status Report provided to the City did not include information about disbursements from the Loan Fund. *Id.*[20] However, it denied summary judgment against Drummon and the other co-defendants because they were not parties to the contract. *Id.*

### 2.    Implied Covenant of Good Faith and Fair Dealing

Under New Jersey law, a party violates the implied covenant of good faith and fair dealing where he has "engaged in some conduct that denied the benefit of the bargain originally intended by the parties." *Id.* at *16 (quoting *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 864 A.2d 387, 396 (N.J. 2005)). Initially, the Court noted that Zemurray's failure to disclose to the City its contemporaneous negotiations to acquire TN BIDCO was not indicative of bad faith. A business generally has no affirmative duty of disclosure to another business absent a fiduciary duty or special relationship. *Id.* (citing *Harvey v. Nissan N. Am., Inc.*, No. C-12016-04, 2005 WL 1252341, at *4 (N.J. Sup. Ct. Ch. Div. Apr. 29, 2005)). Prior to assuming control of the City's $3 million, Zemurray was not a fiduciary. *Id.*

---

[20]    The Court also found that Zemurray failed to provide a reduced estimate for aggregate lending as required by the MOU. *District Court Decision*, 2017 WL 6638203, at *15.

The Court explained that Zemurray's actions did not rise to the level of bad faith needed to establish a breach of the implied covenant and denied the City's motion on this count:

> Ultimately, the record does not establish that Drummon, acting on behalf of Zemurray, had acted with "ill motives and without any legitimate purpose." *Brunswick*, 864 A.2d at 396. Much of what can be explained by malice is equally explained by ignorance, mistake, or confusion. This deal was inked on a contract less sophisticated than a pizza parlor job application. That the parties subsequently had difficulties on the follow-through is unsurprising. It is eminently plausible to this Court that Zemurray thought it could get clearance to use TN BIDCO for the Lending Program, or simply had no idea what it was doing. Whatever the case, the City has not met its burden in proving Zemurray acted in bad faith in performing its loosely-defined obligations under the [MOU]. There are other explanations, many of them unflattering, but still sufficient for this Court to deny the City's motion for summary judgment as to this claim against Zemurray.

*Id.* at *17 (footnote omitted).  The District Court also denied the City's motion as to Drummon on the separate ground that he was not a party to the contract.

### 3.    Fraud

The elements of a fraud claim under New Jersey law are "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; (5) resulting damages." *Id.* at *18 (quoting *Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 525 (D.N.J. 2008)).  Initially, the Court observed that the City had alleged two types of fraud: (1) fraud in the inducement, i.e., the City was induced to select Drummon, Zemurray, and TN BIDCO rather than another company, and (2) fraud in the performance, i.e., Zemurray failed to report and account for the funds and to refund the money to the City.  *Id.*  The Court rejected the latter argument because "[f]raud in the performance is fraud arising from a contractual relationship[.]" *Id.* (citing *Unifoil Corp. v. Cheque Printers & Encoders Ltd.*, 622 F. Supp. 268, 271 (D.N.J. 1985)).

The Court noted that Zemurray had made two misrepresentations. First, Zemurray told the City that it would "contract with" TN BIDCO but subsequently acquired TN BIDCO. The Court observed that it was unclear "that the Defendants planned to purchase TN BIDCO in knowing violation of the [MOU] with the intent of inducing the City into the [MOU]." *Id.* The Court was not convinced by the City's theory and observed that, "[o]f the explanations available for what happened here, human error is at least as compelling an explanation as fraudulent intent." *Id.*

Second, Zemurray misrepresented TN BIDCO's ability to originate residential loans. *Id.* The record was clear that TN BIDCO could not originate residential loans, but Drummon went forward with the MOU despite knowing about this limitation. *Id.* Nonetheless, the Court again found that "mistake can easily explain the conduct of Defendants. The fact that the Lending Program envisioned by the parties fell apart spectacularly does not prove Defendants intended that to happen. On summary judgment, the Court will not infer subjective intentions from objective consequences." *Id.* The District Court denied the motion on this count with respect to Zemurray and Drummon.

The Court also declined to make an adverse inference from Drummon's invocation of his Fifth Amendment right. *Id.* ("Drummon's decision to take the Fifth Amendment is neither irregular nor indicative of his involvement in the scheme alleged by the City. We decline to make such an adverse inference in the absence of other evidence that is strongly suggestive of his intent to defraud the City.").

## H.    Initiation of the Bankruptcy Case and Adversary Proceeding,

On March 1, 2019, Drummon filed a chapter 7 bankruptcy case in this Court. *See In re Drummon*, Case No. 19-10670 (Bankr. S.D.N.Y.). By operation of the automatic stay, 11 U.S.C. § 362(a), the District Court Action has been stayed as to Drummon. On June 3, 2019, the City

commenced this adversary proceeding. The Complaint contains five counts for relief. In Counts

One, Two and Three, the City seeks judgments against Drummon determining that all debts owed

by him to the City are non-dischargeable under  11 U.S.C. § 523(a)(2)(A), (a)(4), and (a)(6),

respectively. Complaint ¶¶ 110–22. In Counts Four and Five, the City seeks judgments denying

Drummon a discharge in bankruptcy under 11 U.S.C. § 727(a)(4)(A) and (B), respectively. *Id.*

¶¶ 123–27.

### The Motions

**The Summary Judgment Motions**

    **Background**

On July 7, 2022, Drummon filed a motion to dismiss the adversary proceeding pursuant to

Rule 12(c) of the Federal Rules of Civil Procedure,[21] and to supplement his opposition to the

pending Adverse Inference Motion.[22] On August 30, 2022, Drummon amended the motion (the

"Amended Rule 12(c) Motion").[23] In support of that motion, and in substance, Drummon asserted

that the Court should dismiss the Complaint pursuant to Rules 9(b)[24] and 12(c) because the City

has demonstrated in its discovery production and in its prior court filings that it can never satisfy

the elements of a fraud claim. Amended Rule 12(c) Motion at 2. He said that is so because:

> the City has no evidence to present from any one of the many City representatives
> (mostly attorneys), who interacted with Drummon over the course of months of
> negotiations, that any one of those representatives relied on any statement by

---

[21]  Rule 12(c) is made applicable herein by Rule 7012 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

[22]  *Defendant Drummon's Motion to Dismiss Pursuant to Rule 12(c) and/or His Supplemental Response in Opposition to the City's Motion for an Adverse Inference*, ECF No. 87.

[23]  *Defendant Drummon's Amended Motion to Dismiss Pursuant to Rule 12(c)*, ECF No. 92.

[24]  Rule 9(b) is made applicable herein by Bankruptcy Rule 7009.

Drummon to take an act or make a decision about the agreements that led to a
detrimental result for the City.

*Id.*  In short, he contended that the City had failed to produce evidence identifying the "who, what,

when, where and how" of Drummon's alleged fraudulent conduct because there "is no indication

of a person or persons who allegedly received false information from Drummon upon which that

person or persons relied to enter into either agreement on behalf of the City, and what that

information was and when and where it was received."  *Id.* at 3.  Drummon maintained that,

because of that lack of evidence, the City could not prove fraud against him. *Id.* at 4–8.  He also

asserted that many of the City's allegations in the Complaint are superfluous and do not support

the underlying allegations of fraud. *Id.* at 8–12.

On September 13, 2022, the City filed its opposition to the Amended Rule 12(c) Motion

(the "Rule 12(c) Opposition").[25]  The City argued that the motion was procedurally improper

because Drummon had failed in earlier attempts to attack the sufficiency of the Complaint.  Rule

12(c) Opposition at 4–6.  It also asserted that the Complaint stated claims for relief under sections

523(a)(2)(A), 523(a)(4), and 523(a)(6).  *Id.* at 7–10.  As support for that argument, the City relied

on *Husky Intern. Elecs., Inc. v. Ritz*, 578 U.S. 355 (2016).  *Id.*

On September 21, 2022, Drummon replied to the City's Rule 12(c) Opposition (the

"Rule 12(c) Reply").[26]  He denied that the motion was procedurally improper.  Rule 12(c) Reply

at 2–3.  He also asserted that the City misplaced its reliance on *Husky.*  Briefly, in *Husky*, the

Supreme Court held that for purposes of section 523(a)(2)(A), "actual fraud" is not limited to false

---

[25]  *Plaintiff's Memorandum of Law in Opposition to Defendant Drummon's Amended Motion to Dismiss Pursuant to Rule 12(c),* ECF No. 93.

[26]  *Defendant Drummon's Reply to Plaintiff's Opposition to His Motion to Dismiss Pursuant to Rule 12(c)*, ECF No. 97.

statements on which the creditor relies, but instead can include a fraudulent conveyance of property to evade payment to creditors without a false statement to such creditors. *See Husky*, 578 U.S. at 366 ("Because we must give the phrase 'actual fraud' in §523(a)(2)(A) the meaning it has long held, we interpret 'actual fraud' to encompass fraudulent conveyance schemes, even when those schemes do not involve a false representation."). Drummon asserted that, on the face of the pleadings, it is factually impossible for Drummon to have "fraudulently conveyed" the City's funds to evade an obligation owed to the City, because no such obligation existed at the time of the transfer. Rule 12(c) Reply at 6–7. He argued that the "four corners of the Adversary Complaint are devoid of facts to support an alleged 'actual fraud' by way of a fraudulent conveyance made without a statement on which the creditor relied." *Id.* at 7. He also asserted that the Court should dismiss the Complaint because:

> (i) Whether Count 1 of the Complaint is analyzed under section 523(a)(2)(A) for allegations of "false pretenses" or "false representations," which require allegations of reliance, or "actual fraud," which includes fraudulent conveyances without reliance on false statements, the Complaint does not include allegations of fact that satisfy the elements of fraud and must be dismissed for failure to satisfy Rule 9(b).
>
> (ii) Count 2 of the Complaint fails to allege a violation of section 523(a)(4) because it does not allege fraud based on false representations with sufficient particularity, and the alternative under *Husky* of a fraudulent conveyance is a factual impossibility under the allegations of the Complaint. Moreover, the Complaint does not allege that Drummon was a fiduciary of the City, and the facts alleged do not support any inference that Drummon was a fiduciary.
>
> (iii) In *Husky*, the Supreme Court noted that debtors who commit fraudulent conveyances and the debtors who make false representations under § 523(a)(2)(A) could likewise also inflict 'willful and malicious injury' under § 523(a)(6)." *Husky*, 578 U.S. at 363. Drummon asserts that the City's claim under section 523(a)(6) fails on the face of the Complaint because the City did not sufficiently articulate facts to support claims for false representations (and reliance thereon) and a fraudulent conveyance is a factual impossibility.

*See id.* at 7–8.

22

By order dated October 5, 2022, the Court converted the Amended Motion to Dismiss into a Motion for Summary Judgment.[27]  On November 9, 2022, Drummon filed the Drummon SJ Motion, the Local Bankruptcy Rule 7056-1 affidavit, and other sworn statements in support of the Drummon SJ Motion.[28]  On November 23, 2022, the City filed the City SJ Motion, the Local Bankruptcy Rule 7056-1 affidavit, and other sworn statements in support of the motion.[29]  On December 5, 2022, Drummon filed his opposition to the City SJ Motion (the "Drummon Opposition"),[30] and on December 8, 2022, he filed his reply to the City's opposition to his motion for summary judgment (the "Drummon SJ Reply").[31]  Also on December 8, 2022, the City filed its reply to Drummon's opposition to its cross-motion for summary judgment (the "City SJ Reply").[32]

In support of the Drummon SJ Motion, Drummon essentially contends that he is entitled to summary judgment dismissing Counts One, Two and Three of the Complaint because the City's theory of fraud is not substantiated by the representatives of the City who were involved with the negotiation and execution of the MOU and Escrow Agreement.  He asserts that the City cannot

---

[27]  *Minute Order*, ECF No. 98.

[28]  *Defendant Drummon's Motion for Summary Judgment*, ECF No. 100; *Defendant Drummon's Memorandum of Points and Authorities in Support of His Motion for Summary Judgment*, ECF No. 101; *Defendant Drummon's Statement of Facts in Support of His Motion for Summary Judgment*, ECF No. 102; *see supra* n.8.

[29]  *Cross-Motion of the City of Atlantic City for Summary Judgment Pursuant to FRCP 56, Incorporated into the Federal Rules of Bankruptcy Procedure by FRBP 7056, and Local Civil Rule 7056-1*, ECF No. 105; *The City of Atlantic City's Memorandum of Law in Opposition to Defendant Drummon's Motion for Summary Judgment and in Support of the City's Cross-Motion for Summary Judgment and for an Adverse Inference*, ECF No. 104; *The City of Atlantic City's Statement of Additional Undisputed Material Facts in Support of Its Opposition to Defendant Drummon's Motion for Summary Judgment and the City's Cross-Motion for Summary Judgment*, ECF No. 104-1; *see supra* n.8.

[30]  *Defendant Drummon's Opposition to the City of Atlantic City's Cross-Motion for Summary Judgment*, ECF No. 106.

[31]  *Defendant Drummon's Reply to the City of Atlantic City's Opposition to His Motion for Summary Judgment*, ECF No. 108.

[32]  *Reply in Further Support of City of Atlantic City's Cross Motion for Summary Judgment*, ECF No. 109.

meet its burden of demonstrating fraud because it cannot put forth evidence from a percipient witness in support of the fraud claim. He argues that the lengthy detailed arms-length negotiation between the City and Zemurray, through their respective agents, do not support the fraud claim, and that the City has not produced evidence identifying particular people who, in entering into the MOU or Escrow Agreement, relied on false statements made by Drummon. Drummon SJ Motion at 7. Drummon maintains that the record is devoid of any evidence inculpating him with respect to defrauding the City—instead, the record reflects that there were "months of exhaustive, rigorous and extremely complex negotiations . . . which ultimately led to the MOU and Escrow Agreement." *Id.* at 8. He asserts that he participated in negotiations alongside two other individuals, and that the City had a total of eight negotiators—six of these were attorneys, and the other two were Mayor Langford and Eddie Lax. *Id.* at 8–9. Drummon stresses that "there is never *any* indication that *any* percipient witness received a representation (or alleged misrepresentation) on which the witness *relied* to compel the City to enter into the MOU and/or the Escrow Agreement." *Id.* at 9. Drummon also makes the point that any communications he made after the MOU and Escrow Agreement were entered into were irrelevant because those communications could not have induced the City to enter into already-extant agreements. *Id.* at 12–13. This is because there is no cause of action for fraud in the performance of a contract, and "the City has neither alleged sufficient facts of fraud in the inducement in the Adversary Complaint, nor produced evidence of fraud in discovery or in court filings." *Id.* Accordingly, Drummon contends that because there is no evidence of a misrepresentation by him that induced reliance, he is entitled to summary judgment dismissing Counts One, Two, and Three of the Complaint.

The City contends that it is entitled to summary judgment on Counts One, Two and Three of the Complaint. Citing *Husky*, the City argues that "the Supreme Court has recognized that

certain instances of fraud, 'like fraudulent conveyance schemes . . . can be effected without a false representation.'"  City SJ Motion at 5 (quoting *Husky*, 578 U.S. at 359).  The City says that the undisputed facts establish a "fraudulent scheme" sufficient to rise to the level of fraud under the Bankruptcy Code.  *Id.* at 6 (citing *Husky*, 578 U.S. at 366 ((holding that 11 U.S.C. §523(a)(2)(A) is sufficiently alleged where the party alleges a fraudulent scheme and where "[t]he debtors who commit fraudulent conveyances *and* the debtors who make fraudulent representations under § 523(a)(2)(a) could likewise also inflict 'willful and malicious injury' under § 523(a)(6).").

The City asserts that, at a minimum, Drummon has not met his burden of establishing that no reliance occurred.  *Id.*  As support, it contends that the August 28 Proposal and the Second Proposal constitute false statements upon which City representatives relied.  *Id.*  It also says that the "undisputed facts show a litany of misrepresentations made by Zemurray, through Drummon in order to induce the City to enter into the [MOU] . . . ."  *Id.*  In the Complaint, the City cites to the following alleged misrepresentations upon which it relied in entering into the MOU and Escrow Agreement:

- Drummon represented to the City that he had the requisite experience and expertise to implement and oversee administration of the loan program.

- Drummon represented to the City that TN BIDCO would be a SBA-Certified lender for the loan program, even though he knew that TN BIDCO was not approved to make residential loans.

- Drummon represented to the City that loan origination functions under the MOU would be completed by TN BIDCO.

- Drummon represented to the City that the Escrow Fund would not be distributed without the express authorization of the City.

- Represented to the City that the loan funds would be returned shortly, were liquid and set aside for the City.

25

- Represented to the City that the money for the loan program would be accounted for in quarterly reports.

Complaint ¶ 111.  Relying on *Husky*, the City also points to actions taken by Zemurray and Drummon after Zemurray and the City executed the MOU and Escrow Agreement, as evidence of an "elaborate scheme intended to defraud the City" that "is exactly what was found [in *Husky*] to constitute actual fraud via a fraudulent conveyance scheme pursuant to 11 U.S.C.§523(a)(2)(A)."  City SJ Motion at 7–8.

### Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. It is made applicable herein by Bankruptcy Rule 7056.  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  Thus, in adjudicating a motion for summary judgment, a court does not resolve disputed issues of fact.  Rather, it only considers whether there is a genuine issue to be tried.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (observing that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial").  In making that determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587; *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) ("Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.").  The Court must view the evidence in the light most favorable to the non-moving party. *Liberty Lobby*, 477 U.S. at 255.

26

A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Courts find that there is no genuine dispute as to any material fact where "(1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material)." *City of New York v. Tavern on the Green Int'l LLC*, 351 F. Supp. 3d 680, 687 (S.D.N.Y. 2018) (citations omitted).

The moving party bears the initial burden of showing that the undisputed facts entitle it to judgment as a matter of law. *Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61 (2d Cir. 1995). If the moving party carries the initial burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008); *see Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) ("[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." (alteration in original) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)). The non-moving party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). In that way, "summary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (citing *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109–10 (3d Cir. 1985)). "After

19-01211-jlg    Doc 110    Filed 11/30/23    Entered 11/30/23 15:41:20    Main Document
Pg 28 of 59


the non-moving party to the summary judgment motion has been afforded a sufficient time for discovery, summary judgment must be entered against it where it fails to make a showing sufficient to establish the existence of an element essential to its case and on which it has the burden of proof at trial." *In re Worldcom, Inc.*, 374 B.R. 94, 105 (Bankr. S.D.N.Y. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

Where, as here, there are competing motions for summary judgment, "each moving party 'has the burden of presenting evidence to support its motion that would allow the district court, if appropriate, to direct a verdict in its favor.'" *McDonnell v. First Unum Life Ins. Co.*, No. 10-cv-8140, 2013 WL 3975941, at *13 (S.D.N.Y. Aug. 5, 2013) (quoting *Barhold v. Rodriguez*, 863 F.2d 233, 236 (2d Cir. 1988)). The moving party's burden does not shift when cross-motions for summary judgment are before the Court. *Larsen v. Prudential Ins. Co. of Am.*, 151 F. Supp. 2d 167, 171 (D. Conn. 2001). Each side must demonstrate the absence of disputed issues of material fact. Each party's motion "must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). Thus, the non-moving party must still come forward with "specific facts showing that there is a genuine issue for trial" in order to defeat a properly supported summary judgment motion. *Liberty Lobby*, 477 U.S. at 256. Accordingly, a court need not enter judgment for either party. *Roberts v. Genting New York LLC*, 68 F.4th 81, 88 (2d Cir. 2023); *see Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3rd Cir. 1968) ("Cross motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified . . . .").

28

**Analysis**

**Complaint Count One**

In support of Count One of the Complaint, the City alleges that "the Debtor engaged in a broad, multi-faceted scheme to defraud the City" through the following material acts:

- Represented to the City that he had the requisite experience and expertise to implement and oversee administration of the Loan Program.

- Represented to the City that TNBIDCO would be an SBA-certified lender for the Loan Program, despite knowing that TN BIDCO was not approved to make residential loans.

- Represented to the City that loan origination functions under the MOU would be completed by TN BIDCO.

- Represented to the City that Escrow Fund would not be distributed without express authorization of the City which was violated.

- Represented to the City several times in writing that the loan funds would be returned shortly, were liquid and set aside for the City.

- Represented to the City that the money for the Loan Program would be accounted for in quarterly reports.

Complaint ¶ 111. It maintains that "[b]y virtue of these acts, the Debtor obtained money, from the City by false pretenses, false representations and/or actual fraud, or by use of a statement in writing that is materially false, and that Debtor caused to be made or published with intent to deceive." *Id.* ¶ 112. Accordingly, the City asserts that the debts owed by Drummon to the City are nondischargeable under section 523(a)(2)(A). *Id.* ¶ 113.

Section 523 excepts certain debts from discharge in exceptional cases; "exceptions to discharge are to be narrowly construed and genuine doubts should be resolved in favor of the debtor." *Denton v. Hyman (In re Hyman)*, 502 F.3d 61, 66 (2d Cir. 2007). In considering claims under section 523(a)(2)(A), the Court applies federal law. *Grogan v. Garner*, 498 U.S. 279, 284

(1991).  Nondischargeability claims must be proven by a preponderance of the evidence.  *Id.* at

286 n.87.

    Section 523(a)(2)(A) states that a discharge under relevant provisions of the Bankruptcy

Code does not discharge an individual debtor from any debt "for money, property, services, or an

extension, renewal, or refinancing of credit," to the extent it was obtained by "false pretenses, a

false representation, or actual fraud, other than a statement respecting the debtor's or an insider's

financial condition."  11 U.S.C. § 523(a)(2)(A).  This subsection contains three independent bases

for nondischargeability.  To establish that a money debt was incurred under "false pretenses," the

plaintiff must show "(1) an implied misrepresentation or conduct by the defendant; (2) promoted

knowingly and willingly by the defendant; (3) creating a contrived and misleading understanding

of the transaction on the part of the plaintiff; (4) which wrongfully induced the plaintiff to advance

money, property, or credit to the defendant."  *Lubit v. Chase* (*In re Chase*), 372 B.R. 125, 128

(Bankr. S.D.N.Y. 2007).  To prove "false representation," the plaintiff must present proof of "a

false or misleading statement made with intent to defraud and justifiable reliance by a creditor."

*Hochstadt v. Lew* (*In re Lew*), No. 11-02404, 2011 WL 5836481, at *3 (Bankr. S.D.N.Y. Nov. 21,

2011) (citing *Chase*, 372 B.R. at 129).  Omissions of fact may qualify as a false representation

"where the circumstances are such that disclosure is necessary to correct what would otherwise be

a false impression."  *Parklex Assocs. v. Deutsch* (*In re Deutsch*), 575 B.R. 590, 599 (Bankr.

S.D.N.Y. 2017) (quoting *Signature Bank v. Banayan* (*In re Banayan*), 468 B.R. 542, 574–75

(Bankr. N.D.N.Y. 2012)).  To show "actual fraud," the plaintiff must generally establish the "five

fingers of fraud," that is "proof that the debtor (1) made a false representation (2) while knowing

it was false (3) with the intent to deceive the creditor; plus the creditor (4) justifiably relied on the

misrepresentation; and (5) suffered pecuniary damages as a result."  *Lew*, 2011 WL 5836481, at

*3 (citing *Field v. Mans*, 516 U.S. 59, 70-71 (1995)); *accord Evans v. Ottimo*, 469 F.3d 278, 283

(2d Cir. 2006) ("The elements of actual fraud under [the] Bankruptcy Code incorporate the general

common law of torts and likewise include a false representation, scienter, reliance, and harm.").

In *Husky*, the Supreme Court ruled that "actual fraud" can encompass other forms of fraud "that

can be effected without a false representation" including "fraudulent conveyance schemes"

designed to hinder collection of debt. *Husky*, 578 U.S. at 359.

"Justifiable reliance" is an "intermediate level of reliance; less than reasonable but more

than mere reliance in fact." *Citik Ka Wah Bank Ltd. v. Wong* (*In re Wong*), 291 B.R. 266, 275

(Bankr. S.D.N.Y. 2003). The Supreme Court has explained that, while a plaintiff's reliance on a

misrepresentation must be justifiable, "this does not mean that his conduct must conform to the

standard of the reasonable man." *Field*, 516 U.S. at 70–71 (quoting Restatement (Second) of Torts

§ 545A, cmt. b (Am. L. Inst. 1976)). However, there are limits on justifiability, and a person is

"required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the

falsity of which would be patent to him if he had utilized his opportunity to make a cursory

examination or investigation." *Id.* (quoting Restatement (Second) of Torts § 541, cmt. a (Am. L.

Inst. 1976)).

The Court first considers the City's motion for an order granting it summary judgment on

Count One. The City contends that the Alleged Drummon Debt is excepted from discharge under

section 523(a)(2)(A) because Drummon intentionally defrauded the City by (i) making actual

misrepresentations to City representatives that they relied upon in transferring $3 million to the

Escrow Account, and (ii) engaging in a scheme to defraud the City of $3 million. *See* City SJ

Motion at 4–8. The Court considers whether the City has met its burden of showing undisputed

facts demonstrating that it is entitled to a judgment as a matter of law denying the discharge of the

Alleged Drummon Debt under section 523(a)(2)(A).  As is explained below, the Court finds that each purported misrepresentation alleged in the Complaint is either unsupported by the factual record, or is only a legal argument that is couched as fact.

*Actual Misrepresentation*

As noted, the City asserts that Drummon made a series of misrepresentations to City representatives.  As support for this motion, the City relies on the alleged misrepresentations listed in ¶ 111 of the Complaint.  The Court considers them below.

The City contends that Drummon misrepresented his qualifications to the City.  City SJ Motion at 2.  However, the City does not identify any particular fact in the record that demonstrates that Drummon misled the City about his qualifications, and the Court could not locate anything in the City Fact Statement that supports this assertion.  In fact, the early communications included in the record suggest that the City was affirmatively seeking Drummon to run the program.  Pierce Affidavit, Ex. B at 10 (July 11, 2012 email between City representatives seeking to arrange a meeting with Drummon); *id.* at 11–13 (July 26 to August 1, 2012 email chain among City representatives and Drummon to arrange a meeting with Drummon).

Second, the City asserts that Drummon misrepresented that TN BIDCO would be an SBA-certified lender for the Loan Program, despite knowing that TN BIDCO was not approved to make residential loans.  City SJ Motion at 2.  It contends that Drummon knew from his correspondence with the Department that TN BIDCO could not originate residential loans but nonetheless entered into the MOU with the City.  *Id.*  However, the record does not support that assertion.

TN BIDCO's role in the program was a moving target.  In the First Proposal, Zemurray was going perform the lending upon its acquisition of TN BIDCO.  Pierce Affidavit, Ex. C at 40.

In the Second Proposal, Zemurray was going to provide loans itself and also "[c]ontract with" TN BIDCO to provide loans. Trenk Certification, Ex. C. After many more permutations,[33] the signed MOU ambiguously stated that Zemurray would "use" TN BIDCO to make loans, MOU at 1, and added that its terms superseded any prior understanding between the parties. *Id.* at 2.[34]

The parties agree that the MOU "expressly stated that TN BIDCO had the lending expertise to carry out the purposes of the Contract and that it was designated as a preferred lender by the Small Business Administration." City Fact Statement ¶ 32. The MOU also states that the monies in the Loan Fund would be "used to assist: (a) small business owners in obtaining financing that will promote business growth and job creation in the City, (b) individuals in obtaining affordable mortgages and/or refinancing or modifying their existing mortgages on properties located in the City, and (c) individuals with rehabilitation and development of other housing stock in the City." *Id.* ¶ 25. Drummon argues that "the City conflates commercial loans, to which the SBA certification applies, and residential loans." Drummon Opposition at 4. The parties agree that, on April 24, 2013, Drummon informed the Tennessee Department of Financial Institutions that TN BIDCO would not originate residential mortgages and "has no present plans to service residential mortgage loans where any direct contact with the consumer is anticipated." City Fact Statement ¶ 22. As the District Court observed, the problem here arises from a failure to draft contract terms carefully—the MOU specifies only that monies in the Loan Fund would be "used to assist" individuals in "obtaining," "refinancing," and "modifying" mortgages. *Id.* ¶ 25; *see District Court*

---

[33]    One version of the MOU apparently contemplated that the City would play a role in approving or denying loans to residents. *See* Pierce Affidavit, Ex. B. at 21 of 52 (email from City representative stating that the MOU must be revised to omit the City's involvement in approving or denying loans).

[34]    To the extent the City purports to rely on the August 28 Proposal, that reliance is unfounded because that proposal is not in the record. In any event, an investment proposal submitted before the First Proposal and Second Proposal could not negate the fact that the terms of the MOU were heavily negotiated following the investment-proposal stage.

*Decision*, 2017 WL 6638203, at *3.  The MOU does not say that the Loan Fund would be used to originate mortgages—it instead says that the Loan Fund will be used to obtain mortgages, without defining the term "obtaining."  *Id.*  The parties mutually failed to define that term.  Tellingly, the City does not point to an instance prior to the MOU where this purported misrepresentation was made.  Even if "obtaining" were defined to be identical to "originate," it would not be a misrepresentation, since acquisition of TN BIDCO could have furthered several of the other goals expressed in the MOU aside from mortgage origination.  In short, a vague contractual provision alone is insufficient to establish that a misrepresentation was made.[35]  *See Chase*, 372 B.R. at 129.

Further, the record in support of the Motions contains evidence about Zemurray's planned workaround to make residential loans through TN BIDCO. Zemurray's former CFO stated that TN BIDCO would fund third-party mortgage lenders who would, in turn, lend to qualifying City residents:

> With respect to the Residential Lending Program as it is referenced in the MOU, Zemurray's business model was structured to meet its obligation under that section of the MOU by having TN BIDCO fund third-party mortgage companies, which would issue loans to applicants from the City who qualified for Community Reinvestment Act (CRA) loans and through the use of favorable federal residential lending programs through entities such as Freddie Mac, Fannie Mae, the VA, and the FHA.

---

[35]    Additionally, the MOU was not a representation between Drummon and the City, but between Zemurray and the City.  Thus, any representation made in the MOU would not be a representation by the debtor, since Drummon is distinct from Zemurray.

Holden Affidavit ¶ 5.[36]  The undisputed facts and record evidence do not support the City's contention that Drummon intentionally misstated TN BIDCO's role in the program to deceive the City.

Third, the City claims that, under the MOU, TN BIDCO would perform loan origination functions.  As discussed above, the MOU does not make that representation.

Fourth, the City asserts that Drummon misrepresented to the City that the "Escrow Fund would not be distributed without express authorization of the City[,] which was violated."  City SJ Motion at 3.  However, the undisputed facts do not support that assertion because it contradicts the plain language of the MOU and Escrow Agreement.  The MOU provides only that monies held in the escrow account "will be used to establish the Loan Fund and shall be released from escrow only pursuant to the terms of the escrow agreement."  City Fact Statement ¶ 29.  In turn, the Escrow Agreement did not require authorization from the City.  It states that "no one other than the authorized signatories of Zemurray shall have the authority to give City National Bank instructions with respect to the Escrow Fund."  Escrow Agreement ¶ 4.  The Escrow Agreement further states that "City National Bank shall disburse all of the funds from the Escrow Fund within three (3) Business Days of City National Bank's receipt of written instructions from the [sic] Zemurray."  *Id.* ¶ 5.  The Escrow Agreement "includes a notation from the escrow bank in the margin next to paragraph 5: '8/21/13.  As discussed with Eddie Lax on 8/21/13, Zemurray is authorized to withdraw funds with the signature of the authorized individual for the company + only one signature is required [initials]."  Drummon Fact Statement ¶ 40.  Further, the parties agree that

---

[36]  The City notes that Mr. Holden did not become employed by Zemurray until after the events relevant to this action. City Fact Statement at 6–7. However, that consideration goes to the weight of the testimony, not its admissibility.

there was "no language in the Executed Agreement limiting Zemurray's authority over the account or requiring permission from the City for Zemurray to take actions on the account." Drummon Fact Statement ¶ 38. On August 23, 2013, fifteen (15) days after the City wired the $3 million into the Escrow Account, Drummon, on behalf of Zemurray, wired the entire $3 million from the Escrow Account to TN BIDCO's account at First Bank. City Fact Statement ¶ 36.

The District Court held that these provisions of the Escrow Agreement do not confer "unfettered" discretion to Zemurray "to instruct the Bank on the use of the fund." *District Court Decision*, 2017 WL 6638203, at *12. However, it found that, because the MOU contemplated contracting with TN BIDCO to administer the Loan Program, Zemurray was not per se prohibited from transferring funds out of the Loan Fund to TN BIDCO. *Id.* at *15. Thus, "the argument, repeated over and over again throughout this litigation, that Zemurray could not transfer anything out of the fund under the [MOU] is flatly contradicted by a straightforward application of the [MOU]'s terms." *Id.* As the District Court held, the terms of the MOU did not prohibit Zemurray's unilateral transfer of escrow funds per se. *Id.* To the extent that the City argues that this contractual term was a representation that the "Escrow Fund would not be distributed without express authorization of the City[,] which was violated," this Court agrees with the District Court's assessment that the MOU allowed for Zemurray's unilateral disbursement of funds from the escrow account, e.g., for the purposes of contracting with TN BIDCO. City SJ Motion at 3; *see District Court Decision*, 2017 WL 6638203, at *15. Thus, this term of the contract did not represent that the City's authorization was required for disbursements from the Escrow Fund. The City offers no other evidence of a pre-MOU statement Drummon made about the Escrow Agreement.

36

Fifth, the City claims that Drummon represented "to the City several times in writing that the loan funds would be returned shortly, were liquid and set aside for the City." City SJ Motion at 3. This argument stems from a series of interactions between Drummon and Michael J. Perugini, ("Perugini") Deputy Solicitor for the City, that took place in 2014.[37] These communications could not form the basis of a claim under section 523(a)(2)(A) because the statute excepts from discharge debts "obtained by" false pretenses, false representations, or actual fraud. *See* 11 U.S.C. § 523(a)(2)(A). In other words, the misrepresentation or other fraudulent conduct must be the catalyst that induced the plaintiff to provide money, property, or services to the defendants. The City could not have relied upon alleged misstatements after the fact in transferring the $3 million into the Loan Fund. *See, e.g.*, *Daily v. Garrett (In re Garrett)*, BAP No. EC-16-1265-HKuB, 2018

---

[37]   On March 19, 2014, Perugini called Drummon and requested information and back up regarding the Loan Fund. City Fact Statement ¶ 69. On March 19, 2014, Perugini e-mailed Drummon memorializing his conversation with Drummon regarding the City's concerns surrounding the $3 million and demanded an accounting of the funds and requested that the funds "remain intact and frozen until which time the City is satisfied that the funds are secure and being used for the purposes set forth in the MOU." *Id.* ¶ 70. On March 20, 2014, Drummon confirmed receipt of Perugini's March 19, 2014 e-mail and stated that he would speak to Zemurray about the City's concerns. *Id.* ¶ 71. On March 20, 2014, Perugini also sent a certified letter to Drummon again requesting information about the City's funds and requested proof that the funds were secured. *Id.* ¶ 72. On March 26, 2014, Drummon e-mailed Perugini stating that Drummon had requested that the bank send the City its funds. *Id.* ¶ 74. On March 27, 2014, Perugini e-mailed Drummon requesting that he call him to discuss the status of the funds. *Id.* ¶ 75. On March 28, 2014, Perugini e-mailed Drummon and advised him that the City would not tolerate his inability to return phone calls or answer letters. *Id.* ¶ 76. On the same day, Perugini spoke with Drummon who stated that he would allow the City to opt out of the program and that he would begin to process the return of the City's funds. *Id.* ¶ 77. On April 2, 2014, Perugini had a phone conference with Drummon regarding his failure to return the City's funds. *Id.* ¶ 78. On April 3, 2014, Perugini received an e-mail from Drummon indicating that Zemurray was restructuring its balance sheet to return the City's funds as "expeditiously as possible." *Id.* ¶ 79. On the same day, Perugini e-mailed Drummon confirming his representation that "Zemurray will immediately take whatever steps necessary to place the City's total fund amount of $3,000,000 into a separate account for the return to the City and for the cancellation of the loan program." *Id.* ¶ 80. The e-mail further confirmed that the City and Zemurray would execute an agreement memorializing the parties' intentions to disband the program and for Zemurray to return the funds. *Id.* Lastly, the e-mail confirmed that Drummon would send the City a bank statement evidencing the placement of the City funds into a separate account. *Id.* Later that day, Perugini received an e-mail from Drummon confirming that Zemurray will execute an agreement with the City to disband the program and for Zemurray to return the City's funds. *Id.* ¶ 81. On April 7, 2014, Perugini sent an e-mail and certified letter to Drummon advising him that he has not taken any action to return the City's money and demanding confirmation that the City's funds were placed in a separate account. *Id.* ¶ 82. Thereafter, from April 7, 2014 through May 28, 2014, Perugini left a series of voice messages for Drummon at his office and on his cell phone and never received a response. *Id.* ¶ 83.

WL 4057228, at *3 (B.A.P. 9th Cir. Aug. 24, 2018) (affirming bankruptcy court ruling that alleged

misrepresentation that occurred after the fact could not have induced the plaintiff); *accord Parker*

*v. Ferland (In re Ferland)*, No. 09-5101, 2010 WL 2600588, at *4 (Bankr. M.D. Ga. June 21,

2010) (debtor's after-the-fact attempt to avoid a payment "may demonstrate some moral failing or

self-deception by Debtor, but it does not prove fraud" under section 523(a)(2)(A)).

Sixth, the City asserts that Drummon misrepresented "that the money for the Loan Program

would be accounted for in quarterly reports." City SJ Motion at 3. The MOU required that during

the five-year period of the Loan Fund, Zemurray would provide the Mayor's office "within forty-

five (45) calendar days after the end of each calendar quarter with a report setting for [sic] the use

of the monies in the Loan Fund for the lending purposes set forth in this MOU." City Fact

Statement ¶ 27. On March 24, 2014, the City received the first and only status report from

Zemurray regarding the Loan Fund. *Id.* ¶ 73. Between the execution of the MOU on May 31,

2013 and March 24, 2014, Zemurray did not provide any quarterly status reports to the City. *Id.*

¶ 86. Zemurray plainly failed to provide the requisite number of quarterly reports, and in the sole

Status Report, Zemurray failed to include the status of the Loan Fund. Indeed, District Judge

Kugler granted summary judgment in favor of the City for Zemurray's breach of the MOU's

reporting obligation. *District Court Decision*, 2017 WL 6638203, at *15. However, these

undisputed facts do not support the City's claim for relief under the Complaint because "[d]ebts

and liabilities based solely upon breach of contract are not excepted from discharge under Section

523(a)." *Dobrayel*, 287 B.R. at 12; *accord Miner v. Mines (In re Mines)*, 630 B.R. 107, (Bankr.

E.D.N.Y. 2021), *aff'd*, 21-cv-03365, 2022 WL 2657514 (E.D.N.Y. 2022); *cf. District Court

Decision*, 2017 WL 6638203, at *18 (dismissing the City's fraud claim to the extent it was based

on Zemurray's failure to report and account for the funds because "[f]raud in the performance is

fraud arising from a contractual relationship"). Thus, as a matter of law, the City's claim arising from Drummon's breach of contract for failure to provide quarterly reports is not excepted from discharge by section 523(a)(2)(A).

In its reply brief, the City asserts two new bases for its contention that Drummon made misrepresentations to the City, both of which rely on the District Court's opinion. First, "the Court found, 'Zemurray misrepresented that it would "contract with" TN BIDCO but subsequently went forward to purchase it. We agree that Zemurray planned to purchase TN BIDCO; Drummon has admitted as much.'" City MSJ Reply at 4 (quoting *District Court Decision*, 2017 WL 6638203, at *18). Second, the City quotes the District Court as saying that "The record is clear that TN BIDCO could not originate residential loans; that Drummon knew, because he was told, that it could not originate residential loans; and that Zemurray went ahead and contracted with the City despite this." *Id.* (quoting *District Court Decision*, 2017 WL 6638203, at *18). However, these undisputed facts do not support the City SJ Motion. The first relies on representations made by Zemurray, not Drummon. The second reflects only that Drummon knew about TN BIDCO's inability to originate residential loans—it does not show that Drummon personally made a representation to the contrary.

*Fraudulent Scheme*

The City also argues that, in any event, it does not need to point to a specific misrepresentation by Drummon. City SJ Motion at 7. It principally contends that the Supreme Court has found section 523(a)(2)(A) does not require an overt misrepresentation where the creditor alleges a fraudulent-conveyance scheme, and that the Court should read that exception broadly to encompass other types of "fraudulent scheme." *Id.* at 6 (citing *Husky*, 578 U.S. at 366). The City says that the "undisputed facts establish a fraudulent scheme" sufficient to establish a

claim under section 523(a)(2)(A), pointing to: (i) the First Proposal and Second Proposal; (ii) the transfers of approximately $3 million out of the Escrow Account, which it says were unauthorized; and (iii) the timeline of Drummon's conduct, and specifically, the withdrawal of $3 million and purchase of TN BIDCO only fifteen days after the City wired the money to the Escrow Account. *Id.* at 7–8.  The City argues that this conduct constitutes an "elaborate scheme" that "is exactly what was found to constitute actual fraud via a fraudulent conveyance scheme pursuant to" section 523(a)(2)(A).  *Id.* at 7.  It contends that the Supreme Court has found section 523(a)(2)(A) does not require an overt misrepresentation where the creditor alleges a fraudulent-conveyance scheme, and that that exception should be read broadly to encompass other types of "fraudulent scheme" like the one in which Drummon allegedly participated.  *Id.* at 6.  However, the City does not define a "fraudulent scheme," nor does it explicitly assert that Drummon participated in a fraudulent-conveyance scheme of the type considered in *Husky*.  *Id.* at 6–7.

Drummon argues that the Supreme Court has obviated the misrepresentation requirement of actual fraud under section 523(a)(2)(A) only where the claim is premised on a fraudulent conveyance.  He says that Zemurray's transfer of funds from the Escrow Account was not a fraudulent conveyance because it was not done to evade a debt.  Rather, the transfer was made pursuant to the terms of the Escrow Agreement, and the repayment obligation would not have existed for another five years after the transfer.  Drummon MSJ Reply at 8.  Likewise, the subsequent distributions of funds from TN BIDCO were not made to evade a debt, and they were therefore not fraudulent conveyances, and in any event Drummon was not involved in those actions.  *Id.* at 9.  Drummon asserts that, because there was no fraudulent conveyance, the City is still required to show that Drummon made a misrepresentation.  *Id.* at 8–9.  He argues that, since

40

the evidence shows the City cannot prove Drummon made a misrepresentation, Drummon is entitled to summary judgment on the section 523(a)(2) claim.

Much of the City's argument relies on the Supreme Court's interpretation in *Husky* of the meaning of "actual fraud" in section 523.  In *Husky*, the Supreme Court examined the scope of section 523 at length.  *See Husky*, 578 U.S. at 362–66.  The Supreme Court held that the term "actual fraud" in section 523(a)(2)(A) should be read to encompass fraudulent conveyances, even though a broad reading of "actual fraud" might include "some of the same conduct" that is also covered by subsections 523(a)(4) and 523(a)(6).  *Id.* at 363.  That is, "a fiduciary who engages in a fraudulent conveyance may find his debt exempted from discharge under either § 523(a)(2)(A) or § 523(a)(4)."  *Id.*  Moreover, "debtors who commit fraudulent conveyances *and* . . . debtors who make false representations under § 523(a)(2)(A) could likewise also inflict 'willful and malicious injury' under § 523(a)(6)."  *Id.*  Importantly, the Supreme Court noted that section 523(a)(4) "covers only debts for fraud while acting as a fiduciary, whereas § 523(a)(2)(A) has no similar limitation."  *Id.*  Further, "§ 523(a)(6) covers debts 'for willful and malicious injury,' whether or not that injury is the result of fraud, whereas § 523(a)(2)(A) covers only fraudulent acts."  *Id.* (quoting *Kawaauhua v. Geiger*, 523 U.S. 57 (1998)).[38]

The Supreme Court parsed the "obtained by" language in section 523(a)(2)(A), noting that the statute is applicable where the recipient of a fraudulent transfer obtains assets "'by' his or her participation in the fraud" and later files for bankruptcy, all debts traceable to the fraudulent conveyance will be nondischargeable under section 523(a)(2)(A).  *Id.* at 365.  These situations

---

[38]    Further, the Court explained that section 727(a)(2) "is broader than § 523(a)(2)(A) in scope—preventing an offending debtor from discharging all debt in bankruptcy," while at the same time "it is narrower than § 523(a)(2)(A) in timing—applying only if the debtor fraudulently conveys assets in the year preceding the bankruptcy filing."  *See Husky*, 578 U.S. at 364.

41

"may be rare because a person who receives fraudulently conveyed assets is not necessarily (or even likely to be) a debtor on the verge of bankruptcy." *Id.* There is a reliance requirement for "fraud perpetrated through a misrepresentation to a creditor." *Id.* (citing *Field*, 516 U.S. at 61). However, that requirement does not apply to "frauds that are not premised on such a misrepresentation." *Id.* at 366. Thus, actual fraud encompasses "fraudulent conveyance schemes, even when those schemes do not involve a false representation." *Id.*

The parties dispute whether the exception established in *Husky* should be limited to fraudulent transfer schemes or applies more broadly to other types of fraud. *Compare* City SJ Motion at 5 *with* Drummon MSJ Reply at 8. Assuming that the exception applies more broadly, the Court is not persuaded that the evidence presented here establishes fraud. The deliberations leading to the MOU were at arms-length with numerous professionals representing the City's interests. The MOU was far from a model of clarity, required Zemurray to "use" TN BIDCO to make loans, and its terms superseded any prior understanding between the parties. MOU at 1–2. The Escrow Agreement permitted Zemurray to disburse funds in the Escrow Account without the City's prior authorization, Escrow Agreement ¶¶ 4–5, and Zemurray spent the funds to acquire TN BIDCO, a bank with "preferred lender" status with the SBA. MOU at 1. Although the Department rejected TN BIDCO's business plan for failure to inject adequate capital, *see* Trenk Certification, Ex. W, Zemurray's plan was apparently to have TN BIDCO directly fund SBA loans and indirectly fund residential loans through third-party mortgage lenders. Holden Affidavit ¶¶ 4–5. Ultimately, no actual loans were made, but Zemurray did create a website which received 199,564 hits, fielded 239 phone calls, received 268 forms, met with sixty City residents, prequalified twelve applicants, and received three loan applications. *See* Status Report.

42

The City made an analogous argument in the District Court Action seeking summary judgment on its claim that Zemurray breached the implied covenant of good faith and fair dealing. There, the District Court could not conclude on the record before it that Drummon acted with ill motives and without any legitimate purpose. *District Court Decision*, 2017 WL 6638203, *17 (quoting *Brunswick*, 864 A.2d at 396). The District Court noted that the MOU lacked sophistication, and Zemurray's obligations thereunder were "loosely-defined." *Id.* Consequently, it was "unsurprising" that the parties had "difficulties on follow-through." *Id.* The District Court concluded that "[i]t is eminently plausible to this Court that Zemurray thought it could get clearance to use TN BIDCO for the Lending Program and did not, or squandered the money after setting up rudiments of an apparently-failed Lending Program, or simply had no idea what it was doing." *Id.*

The Court agrees with the rationale of the District Court. The record here shows that the parties entered into a poorly planned arrangement with an imprecisely worded contract followed by a bungling execution in which Zemurray spent all of the funds to purchase TN BIDCO but had no money left to properly capitalize the bank to the satisfaction of the Department. The record does not support the conclusion that Drummon masterminded a fraudulent scheme to cause the City to fund Zemurray's acquisition of TN BIDCO. Construed in the light most favorable to Drummon, the undisputed facts do not support the City's motion for summary judgment. The Court therefore denies the City's motion on Count One.

Even construed in the light most favorable to the City, there are no facts in the record "sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo*, 536 F.3d at 145. The City has not pointed to any facts in the record evidencing fraudulent conduct by Drummon that induced it into contracting with Zemurray. *See Berckeley*,

455 F.3d at 201. There has been more than a sufficient time for discovery, yet the City has failed to meet its burden to put forth evidence of Drummon's fraudulent conduct in response to the Drummon SJ Motion. *See Worldcom*, 374 B.R. at 105. Accordingly, the Court grants Drummon's motion for summary judgment dismissing Count One of the Complaint.

### Complaint Count Two

In Count Two of the Complaint, the City asserts that Drummon's debts to the City are nondischargeable under 11 U.S.C. § 523(a)(4). Complaint ¶ 117. As support for that Count, the City alleges that Drummon "engaged in a broad multi-faceted scheme to defraud the City," and that "[b]y virtue of these acts, [he] obtained money, from the City, by fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny." Complaint ¶¶ 115–16. In support of its City SJ Motion, the City asserts that, based on the same alleged misconduct that it cited in seeking judgment dismissing Count One, it seeks a judgment of nondischargeability under section 523(a)(4). City SJ Motion at 3.

Section 523(a)(4) of the Bankruptcy Code excepts from discharge a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4).[39] To sustain a claim for fraud or defalcation, "a plaintiff must first show that the defendant was acting in a fiduciary capacity 'with respect to the particular conduct giving rise to the liability which is claimed to be non-dischargeable.'" *Schlosser v. Heinemann (In re*

---

[39] Under section 523(a)(4), the term embezzlement means, "(1) entrustment to the debtor of (2) property (3) of another (4) which the debtor appropriates for his or her own use (5) with intent to defraud." *In re Garland*, 501 B.R. 195, 201–02 (Bankr. S.D.N.Y. 2013) (quoting *Yankowitz Law Firm, P.C. v. Tashlitsky (In re Tashlitsky)*, 492 B.R. 640, 647 (Bankr. E.D.N.Y. 2013)). The term "larceny" means "(1) wrongful taking of property (3) of another (4) without the owner's consent (5) with intent to convert the property," and requires proof that the debtor fraudulently intended to take the property. *Mills v. Caisse (In re Caisse)*, 568 B.R. 6, 15 (Bankr. S.D.N.Y. 2017) (quoting *Race Place of Danbury, Inc. v. Scheller (In re Scheller)*, 265 B.R. 39, 53 (Bankr. S.D.N.Y. 2017)). "To constitute embezzlement, the original taking of the property must be lawful," whereas larceny requires that "the unlawful intent must exist at the time of the original taking." *Scheller*, 265 B.R. at 54. The Complaint does not allege facts in support of a claim for embezzlement or larceny. The facts alleged by the City do not support any such claim.

44

*Heinemann)*, No. 19-9028, 2022 WL 17408094, at *2 (Bankr. S.D.N.Y. Dec. 2, 2022) (quoting *In re Deutsch*, 575 B.R. 590, 600 (Bankr. S.D.N.Y. 2017)).  The definition of "fiduciary capacity" is a matter of federal law and "is more restricted that under the more general common law or state law definition." *Sandak v. Dobrayel (In re Dobrayel)*, 287 B.R. 3, 14 (Bankr. S.D.N.Y. 2002) (collecting authorities); *accord Deutsch*, 575 B.R. at 600.  As it is used in this context, the term "fiduciary capacity" applies only to express or technical trusts. *Zohlman v. Zoldan,* 226 B.R. 767, 772 (Bankr. S.D.N.Y. 1998).  "Constructive or implied trusts, or any trust where the existence of the trust is created merely on the basis of wrongful conduct (a trust ex maleficio) do not create a fiduciary relationship." *Id.*  Bankruptcy courts "may look to state law to determine whether a trust exists." *Chitester v. Watterson* (*In re Watterson* ), 524 B.R. 445, 451 (Bankr. E.D.N.Y. 2015).  The elements of a fraud claim under section 523(a)(4) are the same as under section 523(a)(2)(A). *Sharmat v. Gallen (In re Gallen)*, 559 B.R. 349, 357 (Bankr. S.D.N.Y. 2016).

The City only summarily states that Drummon acted in a fiduciary capacity.  City SJ Motion at 1, 3.  It advances no argument that Drummon acted in a fiduciary capacity as that term is used in dischargeability analyses, i.e., the City does not assert that Drummon was the fiduciary of a formal trust.  Moreover, the Complaint mentions only one trust that was involved in the allegedly fraudulent activities, Lantana Family Trust.  Complaint ¶¶ 23, 57, 96–97.  The City alleges that Lax was the trustee of that trust—not Drummon. *Id.* ¶ 23.  Likewise, the City points to no evidence advanced in this Court that would show Drummon acted in a fiduciary capacity.  While the City SJ Reply chides Drummon for conflating state and federal standards, it wholly ignores the clear federal requirement for prevailing on a section 523(a)(4) claim.  Although he does not point to authority, Drummon correctly addressed the section 523(a)(4) requirement that the plaintiff establish the debtor acted in a fiduciary capacity. *See* Rule 12(c) Reply at 7–8

("Nowhere in the complaint is Drummon alleged to be a fiduciary of the City, and the facts alleged do not support any inference that Drummon was a fiduciary."). Thus, because the undisputed facts show that Drummon was not a fiduciary, the City cannot prevail on summary judgment as to this claim. *See In re Heinemann*, 2022 WL 17408094, at *2. Accordingly, the Court denies the City's motion for summary judgment on Count Two of the Complaint.

Likewise, even construed in the light most favorable to the City, the record evidence clearly demonstrates that Drummon did not occupy a fiduciary position. Accordingly, as a matter of law, Drummon is entitled to summary judgment on Count Two, and the Court grants summary judgment dismissing Count Two of the Complaint.

### Complaint Count Three

Section 523(a)(6) states that a discharge under relevant provisions of the Bankruptcy Code does not discharge an individual debtor from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). "The terms 'willful' and 'malicious' are separate and distinct elements of a claim under the statute that 'should not be joined together into one amorphous standard.'" *In re Heng Li Zhu*, 2022 WL 3364579, at *20 (quoting *In re Bressler*, 387 B.R. 446, 454 (Bankr. S.D.N.Y. 2008)). As used in section 523(a)(6), willful "means deliberate or intentional." *Navistar Fin. Corp. v. Stelluti (In re Stelluti)*, 94 F.3d 84, 87 (2d Cir. 1996) (quoting *In re Stanley*, 66 F.3d 664, 667 (4th Cir. 1995)). Malicious means "wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will." *Id.* at 87–88. "To state a claim for relief under section 523(a)(6), a plaintiff must allege facts demonstrating 'first, that the debtor acted willfully, second, that the debtor acted maliciously, and third, that the debtor's willful and malicious actions caused injury to the creditor

or its property.'" *In re Heng Li Zhu*, 2022 WL 3364579, at *21 (quoting *In re Salim*, No. 13-42974, 2015 WL 1240000, at *22 (Bankr. E.D.N.Y. Mar. 16, 2015)).

The City does not point to facts in the record that demonstrate any of these three elements. Rather, it points to *Husky* for the proposition that "[t]he debtors who commit fraudulent conveyances *and* the debtors who make fraudulent representations under § 523(a)(2)(a) could likewise also inflict willful and malicious injury under § 523(a)(6)." City SJ Motion at 6 (quoting *Husky*, 578 U.S. at 366). But this proposition is irrelevant because the City has not demonstrated facts to prove its section 523(a)(6) claim. As noted above, in this context, *Husky* stands only for the principle that section 523(a)(2)(A) could regulate conduct that is also covered by section 523(a)(6). Otherwise, the City makes no section 523(a)(6) argument. Accordingly, the City has not met its burden on summary judgment with respect to Count Three.

Along these lines, even construing the facts in the light most favorable to the City, there is no evidence in the record to support its contention that Drummon acted maliciously. *See In re Stelluti*, 94 F.3d at 87; *Worldcom*, 374 B.R. at 105; *Berckeley*, 455 F.3d at 201. The overwhelming evidence demonstrates that Drummon and Zemurray negotiated the MOU and Escrow Agreement in pursuit of Zemurray's economic interests, not out of any malice toward the City. Accordingly, the Court grants Drummon's motion for summary judgment dismissing Count Three.

## The Adverse Inference Motion

### Background

On October 27, 2020, the City filed the Adverse Inference Motion, seeking generally, to make an adverse inference with respect to unspecified misconduct committed by Drummon.[40] On

---

[40]    *Motion for an Adverse Inference Against Defendant W. Wesley Drummon*, ECF No. 37.

January 15, 2021, Drummon opposed the motion (the "First AI Opposition").[41]  On January 24, 2021, the City filed its reply brief in further support of the motion.[42]  By order dated March 29, 2021, the Court denied the motion, without prejudice to later consideration.[43]  On August 9, 2022, the City refiled the motion.[44]  On August 30, 2022, Drummon supplemented his opposition to the motion (the "Supp. AI Opposition").[45]  On September 20, 2022, the City filed a reply to Drummon's opposition to the Adverse Inference Motion (the "AI Reply").[46]

Broadly, the City contends that, because Drummon invoked his Fifth Amendment rights in a deposition and at other points in the District Court Action and has invoked his Fifth Amendment rights in this action, the City is entitled to "an adverse inference relating to Drummon's conduct and actions relating to the Memorandum of Understanding . . . with Atlantic City and the City's $3 million that were [sic] loaned to Zemurray based upon Drummon's actions, representations and conduct."  Adverse Inference Motion at 6.  The City does not further specify the type of relief it seeks, e.g., whether it asks the Court to draw an adverse inference with respect to any particular fact.  The City stresses that the adverse inference is particularly important because Drummon is the only party to this litigation "that has any information relating to what happened to the City's

---

[41] *Opposition to Motion for Adverse Inference*, ECF No. 59.

[42] *Plaintiff City of Atlantic City's Reply Brief in Further Support of Its Motion for an Adverse Inference Against Defendant W. Wesley Drummon*, ECF No. 66.

[43] *Order Resolving Various Motions and Scheduling Discovery*, ECF No. 69.

[44] *Memorandum of Law in Support of Plaintiff City of Atlantic City's Motion for an Adverse Inference Against Defendant W. Wesley Drummon*, ECF No. 89.  This document is substantively identical to the City's first motion for an adverse inference in this Court.  *Memorandum of Law in Support of Plaintiff City of Atlantic City's Motion for an Adverse Inference Against Defendant W. Wesley Drummon*, ECF No. 37.

[45] *Defendant Drummon's Memorandum of Points and Authorities in Support of His Supplemental Opposition to the City's Motion for an Adverse Inference*, ECF No. 91.

[46] *Reply to Motion for Adverse Inference*, ECF No. 95

48

money," and "due to Drummon asserting his Fifth Amendment rights, the Court will never hear any of this testimony." *Id.*

Drummon principally contends that an adverse-inference motion must be corroborated by independent evidence, and that there is no independent evidence suggesting that Drummon made a false statement on which the City relied or otherwise engaged in fraudulent conduct. Supp. AI Opposition at 12. Absent any corroborative evidence, the City is not entitled to an adverse inference. Ultimately, the dispute over this motion centers on (i) whether there is independent evidence in the record to justify an adverse inference, and (ii) whether the City has identified the facts it would like the Court to infer.

**Legal Standard**

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. A party may invoke the privilege in both criminal as well as civil matters and during the discovery process as well as during trial. *United States v. Inc. Village of Island Park*, 888 F. Supp. 419, 431 (E.D.N.Y.1995); *see Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973). The Second Circuit has made clear that reliance on the Fifth Amendment in a civil matter, though permitted, may give rise to an adverse inference against the party claiming its benefits. *LiButti v. United States*, 107 F.3d 110, 121 (2d Cir. 1997) ("Shortly after the enactment of Fed. R. Evid. 501, the Supreme Court made it clear in *Baxter v. Palmigiano*, 425 U.S. 308, 96 S. Ct. 1551, 47 L.Ed.2d 810 (1976), that while the Fifth Amendment precludes drawing adverse inferences against defendants in criminal cases, it 'does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.'"). "[R]efusal to answer questions upon asserting the Fifth Amendment privilege is relevant evidence from which the trier of fact in a civil action may draw

whatever inference is reasonable under the circumstances." *Brink's Inc. v. City of New York*, 717 F.2d 700, 710 (2d Cir. 1983); *see also Inc. Vill. of Island Park*, 888 F. Supp. at 432 (holding a litigant may rely on a party's assertion of their Fifth Amendment privilege to confirm matter supported by other independent evidence). The admission of Fifth Amendment invocations is generally subject to Federal Rule of Evidence 403, which weighs probative value against unfair prejudice, and so "'the mere fact that a Fifth Amendment invocation is "damning" to a party's position does not preclude its introduction,' but 'invocations that cross the line to "inflammatory" are more likely to fail under Rule 403.'" *Mirlis v. Greer*, 952 F.3d 36, 46 (2d Cir. 2020) (quoting *Brink's, Inc.*, 717 F.2d at 710).

"The privilege must be invoked on a 'question-by-question' basis, and an adverse inference can only be drawn as to questions that are actually asked." *Picard v. Estate of Mendelow (In re Bernard L. Madoff Invs. Secs. LLC)*, 560 B.R. 208, 226 (Bankr. S.D.N.Y. 2016) (quoting *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1265–66 (9th Cir. 2000)); *see U.S. v. $62,552.00 in U.S. Currency*, No. 03-10153, 2015 WL 251242, at *8 (D. Mass. Jan. 20, 2015) ("The way the adverse inference works is that if a witness refuses to answer a question by invoking the Fifth Amendment, the Court can draw an inference that the answer *to that question* would be adverse to the claimant.").

An adverse inference precludes a defendant in a civil action from using his silence to create issues of fact on summary judgment. *See, e.g.*, *In re Inflight Newspapers, Inc.*, 423 B.R. 6, 14 (Bankr. E.D.N.Y. 2010) ("Because of the potential for abuse of the privilege by defendants who use it to obstruct discovery only to waive it and subject the plaintiff to surprise testimony at trial, the courts recognize the appropriateness of imposing sanctions for a civil defendant's assertion of the privilege during discovery. Thus, a decision to assert the privilege during pre-trial depositions

may be valid grounds for . . . striking affidavits opposing summary judgment motions"); *Bourgal v. Robco Contracting Enters.*, 969 F.Supp. 854, 862 (E.D.N.Y. 1997) (barring defendants, who had obstructed discovery and invoked the Fifth Amendment, from creating issues of fact by submitting affidavits in opposition to the plaintiff's motion for summary judgment); *Vill. of Island Park*, 888 F. Supp. at 431 (court refused to consider affidavits offered in opposition to a motion for summary judgment by affiants who had previously invoked the Fifth Amendment privilege).

However, the testimonial assertion of the Fifth Amendment is not a substitute for relevant and persuasive evidence. As the Supreme Court has explained:

> [W]hile the assertion of the Fifth Amendment privilege against compulsory self-incrimination may be a valid ground upon which a witness . . . declines to answer questions, it has never been thought to be in itself a substitute for evidence that would assist in meeting a burden of production.

*United States v. Rylander*, 460 U.S. 752, 758 (1983).

In the context of summary judgment, "the adverse inference drawn from a party invoking the Fifth Amendment may not be the sole basis for a finding of liability." *In re Jacobs*, 394 B.R. 646, 663 (Bankr. E.D.N.Y. 2008); *see also Fidelity Funding of Cal., Inc. v. Reinhold*, 79 F. Supp. 2d 110, 116 (E.D.N.Y. 1997) ("[T]he evidence produced by a nonmoving party's silence is not sufficiently weighty to carry a moving party's burden in a motion for summary judgment."). That is to say that a "plaintiff still must meet its burden of proof, and [d]efendants' silence, alone, does not automatically give rise to their liability." *SEC v. Global Telecom Servs., L.L.C.*, 325 F.Supp. 2d 94, 109 (D. Conn. 2004). Courts are clear that "a motion for summary judgment cannot be granted on an adverse inference alone; rather, the inference must be weighed with other evidence in the matter in determining whether genuine issues of fact exist." *S.E.C. v. Suman*, 684 F. Supp. 2d 378, 386 (S.D.N.Y. 2010), *aff'd*, 421 F. App'x 86 (2d Cir. 2011) (summary order);

accord *United States v. Nagelberg*, 772 F. Supp. 120, 123 (E.D.N.Y. 1991) (It is well established that "an adverse inference drawn from a defendant's invocation of the Fifth Amendment may not be the sole basis for a finding of liability. Independent, corroborative evidence or wrong-doing must be shown." (citing *United States v. Local 560 of Int'l Bhd. of Teamsters*, 780 F.2d 267, 292–93 n.32 (3d Cir. 1985))).

**Analysis**

The City attaches several exhibits in support of its Adverse Inference Motion, including Drummon's deposition and several other filings from the District Court Action.[47]   The exhibits substantiate the City's assertion that Drummon has invoked his Fifth Amendment rights throughout the prosecution of this case and the District Court Action.  The City principally argues that Drummon is the only party with information about the $3 million that the City loaned to Zemurray, the steps taken to establish the loan program, the "intent of the parties when entering

---

[47]   These exhibits are as follows:

- As Exhibit A, the April 27, 2016 deposition of Drummon.

- As Exhibit B, the City's April 2017 summary-judgment motion in the district-court case, along with its numerous exhibits (and, in turn, those exhibits' exhibits).

- As Exhibit C, the 2017 district-court decision denying the City's motion for summary judgment on the fraud claims.

- As Exhibit D, the January 2019 district-court order (i) requiring any defendant "who has asserted Fifth Amendment protections in discovery and who wishes to testify at trial on those issues" to submit to a deposition, and (ii) requiring Defendants' counsel to provide Plaintiff's counsel with the names of those defendants, if any.  This order contained a 14-day deadline for the compliance of the defendants in that case.

- As Exhibit E, a February 2019 letter from the City to the District of New Jersey, claiming that a defendant in the district-court case had failed to comply with a January 2019 discovery order (distinct from the order attached as Exhibit D).

- As Exhibit F, the March 2019 Consent Judgment.

- As Exhibit G, the September 2019 Notice to Take Deposition (bearing the caption and case number for this adversary proceeding).

- As Exhibit H, the July 2020 letter from Drummon's attorney.

into the MOU," and whether contractual duties were fulfilled. *Id.* at 6. It complains that "due to Drummon asserting his Fifth Amendment rights, the Court will never hear any of this testimony, and Drummon will bever be cross-examined by the City." *Id.* On this basis, the City maintains that "the court should impose an adverse inference relating to Drummon's conduct and actions relating to the [MOU] with Atlantic City and the City's $3 million that were loaned to Zemurray based upon Drummon's actions, representations, and conduct." *Id.*

In opposing the motion, Drummon contends that the City seeks inappropriate relief. First AI Opposition at 8–9. The Court cannot convert "the exclusion of testimony to the creation of unfounded testimony." *Id.* at 8–9. While Drummon's refusal to sit for a pretrial deposition may appropriately preclude him from later testifying at trial, his refusal to be deposed alone does not give rise to an adverse inference. *Id.*

Next, Drummon argues that "the evidence on which an adverse inference is being sought cannot be presented without independent proof of the evidence sought." Supp. AI Opposition at 12 (citing *Mirlis*, 952 F.3d at 46). Because the City has no proof of the elements of its case, Drummon would be unfairly prejudiced if the Court were to draw an adverse inference from his invocation of the Fifth Amendment. *Id.* at 12–13. Accordingly, the City is not entitled to an adverse inference absent corroborative evidence of the facts for which it seeks an adverse inference. First AI Opposition at 5–6. "The only appropriate time to consider the adverse inference is when the record independently reflects evidence of fraud." *Id.* at 9.

Finally, Drummon highlights the District of New Jersey's decision not to draw an adverse inference in its summary-judgment opinion, and he contends that the City has not offered anything additional in support of the Adverse Inference Motion further to justify this Court's arrival at a different result. *Id.* at 2–5. Specifically, the City has not offered any new corroborative evidence

in support of the elements of fraud, and it has not adequately responded to discovery requests for such evidence. *Id.* Thus, Judge Kugler considered an analogous motion for an adverse inference in the district court, he found that it should be denied because there was no independent corroborative evidence, and that same reasoning should hold true here. Supp. AI Opposition at 10–11.

The City has filed a Reply to the Supp. AI Opposition.[48] Most of the AI Reply is devoted to an explanation of the *Mirlis* case, to which Drummon cites. AI Reply at 1–3. As relevant, the City asserts that *Mirlis* is inapposite because there was a jury in that case, and the Second Circuit held only that there was no prejudice from an instruction that the jury could infer that answers to questions on which the declarant invoked the Fifth Amendment might be prejudicial. *Id.* at 3. There is no risk of prejudice to Drummon here, because there is no jury. *Id.*[49] The City contends that the District Court refused to grant an adverse inference at summary judgment only "based on the forum and posture of the case at that time," and this Court should grant an adverse inference "in favor of the City" and "against Drummon" because the case is now in a bankruptcy forum, where there is "no potential jury trial." *Id.* at 4.

### The City Seeks Unspecified Relief

As an initial matter, it is unclear from the motion on which facts, elements of fraud, or other issues the City seeks an adverse inference. It is clear that, in the context of an individual's

---

[48]    *Letter Dated September 20, 2022*, ECF No. 95 (the "AI Reply").

[49]    The City made the same argument, that it was not required to corroborate its adverse-inference motion with independent evidence, in its initial reply prior to the conversion. *Plaintiff City of Atlantic City's Reply Brief in Further Support of Its Motion for an Adverse Inference Against Defendant Wesley W. Drummon*, ECF No. 66 (the "First AI Reply"). As relevant, that document asserts that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." First AI Reply at 4 (quoting *Baxter v. Palmigiano*, 425 U.S. 308 (1976)). The City does not explain why it believes this precept from *Baxter*, which explicitly mentions probative evidence, supports its view that independent evidence is not required to support an adverse inference. *Id.*

appearance at a deposition, when a motion for an adverse inference is asserted in response to an individual's Fifth Amendment non-response to a question, another party may seek an adverse inference as to that question. *In re Bernard L. Madoff Invs. Secs. LLC*, 560 B.R. at 226; *see Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d at 1265–66; *$62,552.00 in U.S. Currency*, 2015 WL 251242, at *8. Here, the City only generally asks for an adverse inference "relating to Drummon's conduct and actions relating to the Memorandum of Understanding . . . with Atlantic City and the City's $3 million that were [sic] loaned to Zemurray based upon Drummon's actions, representations and conduct." Adverse Inference Motion at 6. This is too broad a request—the Court cannot draw an amorphous adverse inference about the general circumstances of the case. Simply put, an adverse-inference motion must identify what the movant wishes the court to infer. The City's failure to identify the facts on which it wants the Court to draw an adverse inference is an independent basis for denial of the Adverse Inference Motion.

Incidentally, it is also worth noting that, in addition to Drummon's deposition, the City attaches to the Adverse Inference Motion a July 2020 letter from Drummon's former attorney, in which she stated that Drummon "will assert his Fifth Amendment Rights [sic] at any deposition in this matter." Adverse Inference Motion, Ex. H at 1. The City also states that, in connection with the District Court Action, "Drummon also invoked his Fifth Amendment privilege in his responses to the Requests for Admissions served by the City." Adverse Inference Motion at 2. It is not clear from the face of the motion whether the City requests the Court to draw an adverse inference from all three of these asserted invocations of rights, or some combination of them. Clearly, the July 2020 letter is merely an attorney's representation that her client *intends* to take the Fifth Amendment with respect to any prospective deposition. This alone is not an invocation of the Fifth Amendment, and the Court could not draw any adverse inference from this document on the

55

basis of its innocuous reference to the Fifth Amendment.  As for Drummon's responses to the Requests for Admissions, the City mentions these documents once in passing, and it is unclear whether they have attached them all to the Adverse Inference Motion.  *Id.* at 2.  The Adverse Inference Motion does not explain the contents of the Requests for Admissions nor Drummon's responses thereto, and so the Court has no basis to draw an adverse inference from these documents, wherever they may be.

### The City Advances No Corroborative Evidence

As a separate basis for denying the Adverse Inference Motion, the City has not introduced evidence independently corroborating the matter on which it seeks an adverse inference.  The City asserts that "independent proof" is not "a requirement for an adverse inference to be drawn."  AI Reply.  It does not cite any authority for this proposition—instead, the City contends only that, while *Mirlis* held that the Fifth Amendment does not forbid adverse inferences when a civil party refuses to testify in response to probative evidence against them, that is "not the same as independent proof being a requirement for an adverse inference to be drawn."  *Id.*  Notably, the City concedes that, in *Mirlis*, "there was 'substantial independent evidence to corroborate the inference,'" as well as other circumstances that mitigated any prejudice caused by an adverse inference. *Id.* (quoting *Mirlis*, 952 F.3d at 47).

The Court disagrees with the City.  There is substantial case law that reveals an adverse inference must be supported by independent corroborative evidence.  Case law is clear that a fact on which a party seeks an adverse inference must have some evidentiary corroboration.[50]  *In re*

---

[50]   The requirement for independent corroboration of the facts on which an adverse inference is sought also necessitates that the movant has identified particular facts on which it would like the court to draw an adverse inference.  Plainly, as a matter of logical necessity, it is impossible for a court to assess whether a fact has been corroborated if a movant has not first identified the fact at the heart of that inquiry.

*Jacobs*, 394 B.R. at 663; *Fidelity Funding of Cal., Inc.*, 79 F. Supp. 2d at 116; *Glob. Telecom Servs., L.L.C.*, 325 F. Supp. 2d at 109. Without this requirement, a party invoking his Fifth Amendment rights in a deposition could be deemed to accede to all manner of misdeeds, limited only by his interrogator's imagination, since an adverse inference could be drawn as to any factual matter about which opposing counsel asked him. *See Mirlis*, 952 F.3d at 46 (A principal concern voiced by an earlier adverse-inference case's dissent was "that a party would ask fact-specific, leading questions 'designed to suggest to the jury that but for the privilege the answer in each case would have been "yes"' and 'inevitably invite[] jurors to give evidentiary weight to questions rather than answers.'" (alteration in original) (quoting *Brink's*, 717 F.2d at 716 (Winter, J., dissenting)). In short, the case law is abundantly clear that a party's invocation of his Fifth Amendment privilege against self-incrimination in the civil context does not give rise to an adverse inference absent independent corroborative evidence.

Along these lines, the Court must reject the City's argument that this Court should arrive at a different result than the District Court with respect to an adverse inference because there will be no jury trial here. *See* City SJ Reply at 3–4. Tellingly, the City cites no authority for that argument. *Id.* Like the District Court in the District Court Decision, this Court considers the Adverse Inference Motion at the summary-judgment stage, and the City has likewise failed to advance corroborative evidence of wrongdoing by Drummon here. It is immaterial whether the finder of fact in this case is a jury or a judge—as a matter of law, a factfinder may not infer an adverse fact based on a Fifth Amendment invocation that is not independently corroborated by evidence. *See Mirlis*, 952 F.3d at 46. To do so would be unfairly prejudicial. *See id.*; *see also Brink's, Inc.*, 717 F.2d at 710 (explaining, in the context of a Fifth Amendment invocation, that courts must weigh probative value against potential prejudice pursuant to Fed. R. Evid. 403).

Here, the Court finds no corroborative evidence justifying an adverse inference as to any fact that suggests fraudulent conduct. In 2017, presented with a similar record, the District Court declined to draw an adverse inference from Drummon's exercise of his Fifth Amendment rights based on an absence of corroborative evidence. While that decision is not binding on this court, it is persuasive.

> Drummon's decision to take the Fifth Amendment is neither irregular nor indicative of his involvement in the scheme alleged by the City. We decline to make such an adverse inference in the absence of other evidence that is strongly suggestive of his intent to defraud the City.

*District Court Decision*, 2017 WL 6638203, at *18. Notably, five of the seven exhibits attached to the adverse-inference motion are merely filings from the District Court Action. The two evidentiary exhibits were before the District Court when it denied the adverse-inference motion. No new factual evidence was advanced in support of the instant adverse-inference motion. An independent review of all the exhibits attached to the motion, and all the evidence in the record before the Court in this adversary proceeding, reveals no corroborative evidence of fraudulent activity by Drummon. Indeed, the City even concedes that "Drummon is the only party to this litigation that has any information relating to what happened to the City's money, what steps were taken (if any) to establish the loan program, the intent of the parties when entering into the MOU and whether the contractual duties were ever fulfilled." Adverse Inference Motion at 6. However, it does not follow that, because there is no other testimony as to whether Drummon committed fraud, we must infer that he did so. Such a principle would fly in the face of our bedrock evidentiary requirements. *See, e.g.*, *Rylander*, 460 U.S. at 758. Accordingly, because the City has advanced no corroborative evidence supporting its request for an adverse inference, the request is denied for this additional reason.

**<u>Conclusion</u>**

Based on the foregoing, the Court denies the City SJ Motion and grants the Drummon SJ

Motion.  The Court grants Drummon summary judgment dismissing Counts One, Two, and Three

of the Complaint.  The Court denies the Adverse Inference Motion.

IT IS SO ORDERED.

Dated: New York, New York
       November 30, 2023

/s/ *James L. Garrity, Jr.*
Hon. James L. Garrity, Jr.
U.S. Bankruptcy Judge